Henry P. Baer, Jr.
Tony Miodonka
**FINN DIXON & HERLING LLP**
177 Broad Street
Stamford, Connecticut 06901
Telephone: (203) 325-5000
Facsimile: (203) 325-5001

*Proposed Counsel to Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>INTERNATIONAL FOREIGN EXCHANGE<br>CONCEPTS HOLDINGS, INC.,<br><br>        Debtor. | Chapter 11<br><br>Case No. 13-13379 (REG) |
| In re:<br><br>INTERNATIONAL FOREIGN EXCHANGE<br>CONCEPTS, L.P.,<br><br>        Debtor. | Chapter 11<br><br>Case No. 13-13380 (REG) |

**MOTION OF INTERNATIONAL FOREIGN EXCHANGE CONCEPTS, L.P.
AND INTERNATIONAL FOREIGN EXCHANGE CONCEPTS HOLDINGS, INC.
FOR AN ORDER (A) AUTHORIZING AND APPROVING POSTPETITION
FINANCING, (B) GRANTING LIENS, SECURITY INTERESTS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(C) MODIFYING AUTOMATIC STAY, AND (D) SCHEDULING INTERIM AND
FINAL HEARINGS, PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364 AND
FED. R. BANKR. P. 2002, 4001(c), (d) AND LOCAL BANKRUPTCY RULE 4001-2**

International Foreign Exchange Concepts Holdings, Inc. ("IFEC") and International

Foreign Exchange Concepts, L.P. ("IFEC LP," and together with IFEC, the "Debtors"), as

debtors and debtors-in-possession submit this motion (the "Motion") pursuant to sections 105(a),

361, 362, 363, and 364 of Chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") and Rules 4001(b), (c) and 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure

of this Court (the "Local Rules"), for entry of an order authorizing the Debtors to obtain

postpetition financing (the "DIP Facility") from AMF-FXC Finance, LLC ("AMF" or the

"Lender") pursuant to the terms and conditions set forth in that certain Debtor-In-Possession

Term Loan Promissory Note (as the same may be amended, supplemented, restated or otherwise

modified from time to time, the "DIP Note") (attached hereto as Exhibit A), together with all

agreements, documents, and instruments delivered in connection with the DIP Facility

(collectively, and including the DIP Note, the "DIP Loan Documents") by and among AMF, the

Debtors, and the guarantors unconditionally guarantying, jointly and severally, the Debtors'

obligations thereunder. Terms not otherwise defined herein have the meanings ascribed to them

in the proposed interim order attached hereto as Exhibit B (the "Interim Order"). The Debtors

represent as follows:

## RELIEF SOUGHT

1.    As explained below, the Debtors have an immediate need for postpetition

financing. The Debtors require working capital to continue to fund their business wind-down

and to pay administrative expenses incurred in these Chapter 11 cases. By this Motion, the

Debtors seek the following relief:

(i)    Entry of an Interim Order:[1]

(a)    authorizing the Debtors to obtain the DIP Facility in an amount not
greater than $1.448 million (the "Maximum Borrowing," including
the Maximum Interim Borrowing (as defined below));

---

[1]    To the extent there are any inconsistencies between this Motion and the Interim Order, the terms of
the Interim Order shall control.

(b)    authorizing the Debtors to execute the DIP Note and other DIP Loan Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Facility;

(c)    authorizing the Debtors to grant to AMF first priority liens upon and security interests in substantially all of the Debtors' assets, to secure all obligations owing under the DIP Loan Documents (collectively, and including, without limitation, all "Obligations" as defined in the DIP Note, the "DIP Obligations"), subject and subordinate only to the Carve-Out (as defined below);

(d)    authorizing the grant of allowed superpriority administrative expense claims to AMF, subject and subordinate only to the Carve-Out; and

(e)    scheduling, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of an Interim Order authorizing the Debtors to borrow, on an interim basis, an amount up to $800,000 (the "Maximum Interim Borrowing") pursuant to the terms of the proposed Interim Order and the DIP Loan Documents; and

(f)    modifying the automatic stay to the extent hereinafter set forth; and

(ii)    Entry of a final order (the "Final Order"):

(a)    approving the DIP Facility on a permanent basis pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code;

(b)    authorizing the Debtors, under sections 364(c)(2) and (d) of the Bankruptcy Code and Bankruptcy Rules 4001 and 6004, to obtain the Maximum Borrowing, pursuant to the terms and conditions of the DIP Loan Documents.

## JURISDICTION AND VENUE

2.    The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334. These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A). Venue of these proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, 1107(a) and 1108 of the Bankruptcy Code, Rules 4001 and 6003 of the Federal Rules of Bankruptcy Procedure, and Rule

9013-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

## BACKGROUND

3.      On October 17, 2013 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").   The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 cases.  No committees have been appointed or designated.

Overview of the Debtors' Business

4.      Headquartered in New York City, FX Concepts (as the overall business is widely known) was one of the world's leading independent providers of foreign currency management and research services.   Founded in 1981, the firm began as an advisory firm specializing in quantitative currency forecasting and providing research to major corporate and bank treasuries actively managing currency risk. The firm began managing external capital in 1988, and at its peak the fund managed over $14 billion in investments.  As recently as February, 2013, the firm reported assets under management of more than $1 billion.

5.      FX Concepts managed currencies for institutional investors through overlay and absolute return programs, and employed a methodology integrating the study of cycles, quantitative model-building, and technical forecasting.   In addition to its investment management operations, the firm published and sold research on foreign exchange, interest rates, equities and commodities as part of a separate business.

6.    The entire business enterprise of FX Concepts consisted of 11 separate entities. Overseas operations were housed in FX Concepts (Asia Pacific) Ltd, FX Concepts (Switzerland) GmbH, FX Concepts (Singapore) Ltd., FX Concepts (Bermuda) Limited, FX Concepts (UK) Ltd., and FX Concepts (B.V.I.), each of which is directly or indirectly funded by FX Concepts (UK Holdings) Ltd. (together, the "Overseas Companies"). None of the Overseas Companies are debtors in these proceedings, and to date none have initiated insolvency proceedings in their respective local jurisdictions.

7.    In addition to the Debtors, the firm's domestic operations were conducted by FX Concepts, LLC and FX Concepts Trading Advisor LLC. These entities functioned as investment managers and advisors for the various FX Concepts funds. Neither FX Concepts, LLC nor FX Concepts Trading Advisor LLC are debtors in these proceedings, and neither have otherwise initiated insolvency proceedings.

8.    The Debtors in these cases are the ultimate direct and indirect parents of all other FX Concepts entities. IFEC LP holds all of the issued and outstanding equity interests in FX Concepts (UK Holdings) Ltd., FX Concepts LLC and FX Concepts Trading Advisors LLC. IFEC, in turn, is the general partner in IFEC LP.

9.    The FX Concepts funds have been shut down and the investor funds (all of which are held in and managed by non-debtors) have either been or will soon be returned to investors. There have been no allegations of misconduct, fraud, or mismanagement by any of the FX Concepts entities, employees or advisors, and other than ordinary course investment losses no investor funds have been lost.

Funding and Capital Structure

        10.    FX Concepts is independent and is almost entirely employee-owned. While John Taylor (including family trusts), the Chairman and Founder of the firm, controls 47% of the shares, Jonathan H. Clark (including family trusts) owns 22%, and Philip E. Simotas owns 15%, two thirds of its former employees are shareholders.

        11.    Although the Debtors have no secured debt, they financed their operations with unsecured debt.  Specifically, IFEC LP entered into a Note Purchase Agreement (the "2006 NPA"), dated as of November 28, 2006, with AMF-FXC Finance, LLC ("AMF") and Asset Management Finance Corporation, as lenders.  As part of the 2006 NPA, IFEC LP issued a Revenue Share Note (as amended and restated in 2012, the "2006 Revenue Share Note"), dated as of November 28, 2006, in favor of AMF in the principal amount of $20 million.   In connection with the 2006 NPA and the 2006 Revenue Share Note, the Debtor also issued a Make-Whole Promissory Note (as amended and restated in 2012, the "2006 Make-Whole Note"), dated as of November 28, 2006, in favor of AMF.  By its terms, the 2006 Make-Whole Note only becomes effective after certain specified events of default.

        12.    In June 2010, IFEC LP entered into a second Note Purchase Agreement (as amended, the "2010 NPA," and together with the 2006 NPA, the "NPAs"), dated as of June 7, 2010, with AMF and Asset Management Finance Corporation, as lenders.  As part of the 2010 NPA, IFEC LP issued another Revenue Share Note (as amended and restated in 2012, the "2010 Revenue Share Note," and together with the 2006 Revenue Share Note, the "Revenue Shares Notes"), dated as of June 7, 2010, in favor of AMF, and also in the principal amount of $20 million.   In connection with the 2010 NPA and the 2010 Revenue Share Note, the Debtor also issued a Make-Whole Promissory Note (as amended and restated in 2012, the "2010 Make-

Whole Note," and together with the 2006 Make-Whole Note, the "Make-Whole Notes"), dated as of June 7, 2010, in favor of AMF. As is the case with the 2006 Make-Whole Note, the 2010 Make-Whole Note only becomes effective after certain specified events of default. The NPAs, Revenue Share Notes, and Make-Whole Notes are collectively referred to herein as the "Pre-Petition Loan Documents."

13.    In 2012, as a result of their financial condition, the Debtors and AMF negotiated certain relief from the Debtors' obligations under the Loan Documents (the "2012 Agreement"). Among other things, the Debtors and AMF agreed that the Debtors would have the right to defer certain quarterly payments due to AMF under the Revenue Share Notes for up to 8 quarters. In connection with the 2012 Agreement, John Taylor, the Chief Executive Officer and Founder of the Debtors, entered into a personal Guarantee, dated as of December 14, 2012, in favor of AMF, under which Mr. Taylor guaranteed the payment of any such deferred payments. In connection with that personal guarantee, Mr. Taylor granted security interests to AMF to secure his obligations under the guarantee.

14.    According to the Debtors' books and records, approximately $34.4 million is due under the Revenue Share Notes. AMF has asserted that the Make-Whole Notes have been triggered (which, if true, would replace the Revenue Share Notes), but have not yet asserted a specific amount due thereunder.

Events Leading to Bankruptcy

15.    The collapse of the Debtors' business is largely tied to the deterioration of the foreign currency market. According to a recent Wall Street Journal article, currency funds in general are down this year for the third year in a row. According to that same article, "assets in

hedge-fund strategies dedicated to currency trading have fallen to $21.6 billion, down nearly 50%" from its peak.

16.    In connection with that global pullback in the market in general, the Debtors' performance lagged, and investors eventually began redeeming their investments. Although the Debtors worked for months to negotiate relief from AMF and to identify alternative business solutions upon which they could restructure business operations, those negotiations proved unsuccessful. The 'final straw' came in September, 2013, when the San Francisco Employee Retirement System gave notice that it was redeeming its investment in full. That investment made up almost 66% of the Debtors' total assets under management at that point, and the redemption proved fatal to the Debtors' business.

17.    The Debtors have now largely terminated all operations and are otherwise winding down all business and maximizing the value of their assets for the benefit of their creditors. They have terminated all employees other than a handful who are necessary for the wind-down, and are currently in the process of liquidating their remaining assets. They have filed for protection under Chapter 11 of the Bankruptcy Code to preserve value while they undertake that orderly liquidation.

The Debtors' Pre-petition Indebtedness and Acknowledgements

18.    The Debtors acknowledge, represent, stipulate, and agree that:

(i)    the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents;

(ii)        until such time as all DIP Obligations are indefeasibly paid in full in cash (or satisfied by application of a credit bid) and completely satisfied, and the commitments under the DIP Loan Documents are terminated in accordance with the terms of the DIP Loan Documents, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the Postpetition Liens by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien pursuant to section 364(d) of the Bankruptcy Code or otherwise, except as otherwise set forth herein and except with respect to the Carve-Out (as defined below);

(iii)        until such time as all DIP Obligations are indefeasibly paid in full in cash (or satisfied by application of the credit bid) and completely satisfied, and the commitments under the DIP Loan Documents are terminated in accordance with the terms of the DIP Loan Documents, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under Sections 105, 326, 328, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code having priority equal or superior to the priority of the DIP Superpriority Claim, except as otherwise set forth herein and except with respect to the Carve-Out;

(iv)        as of the Petition Date, the aggregate amount of the debt due to AMF under the Pre-Petition Loan Documents is at least $34 million; and

(v)        and any payments made to AMF on account of the Prepetition Indebtedness prior to the Petition Date were made in the ordinary course of business and did not diminish any property otherwise available for distribution to other unsecured creditors.

## The Debtors' Urgent Need for Postpetition Financing

19.    The Debtors require the DIP Facility to operate their businesses and to fund, among other things, ongoing working capital requirements, and for other purposes permitted by the DIP Loan Documents. The Debtors will suffer immediate and irreparable harm if the Motion is denied. Under the circumstances, the Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents. A loan facility in the amount provided by the DIP Loan Documents is unavailable without granting to AMF superpriority claims, liens, and security interests, pursuant to sections 364(c) and (d) of the Bankruptcy Code, as provided for in the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the DIP Facility represents the best working capital financing available to them under the circumstances.

20.    Accordingly, the Debtors determined in the exercise of their sound business judgment that they need access to borrowings to be provided under the DIP Loan Documents. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and their creditors. The liquidity to be provided under the DIP Loan Documents will enable the Debtors to wind-down their businesses, conduct an orderly liquidation, and preserve value while they undertake that orderly liquidation. In addition, because the Debtors do not have sufficient funds to meet expenses necessary for the continued operation of their businesses before a final hearing can be held, it is essential that they obtain interim financing to maximize value of the Debtors' assets and to avoid immediate and irreparable harm to their estate and their creditors.

The Debtors' Negotiations to Acquire Postpetition Financing

   21. After evaluating alternative sources of credit, the Debtors determined that their efforts to arrange postpetition financing should be focused on AMF. The Debtors requested postpetition financing from AMF on both an unsecured and non-priming basis, but AMF was unwilling to extend loans to the Debtors in the absence of the protections described herein. Given the current state of their businesses, the Debtors determined, in their reasonable business judgment based on requests to alternative lenders, that they have no other options from which to obtain postpetition financing, other than from AMF pursuant to the DIP Loan Documents. Nevertheless, the Debtors believe that the proposal for the DIP Facility received from AMF is fair, competitive and adequately addresses the Debtors' liquidity needs.

   22. Prior to the Petition Date, the Debtors engaged in good faith, arm's length negotiations with AMF to discuss the terms of the DIP Facility in the context of a Chapter 11 case. These negotiations culminated in an agreement by AMF to provide postpetition financing to the Debtors on the terms and conditions set forth in the DIP Loan Documents.

The Proposed DIP Facility

   23. The principal terms of the DIP Loan Documents are summarized below:[2]

| Lender | AMF-FXC Finance, LLC |
|---|---|
| **Borrower** | International Foreign Exchange Concepts, L.P. |
| **Guarantors** | International Foreign Exchange Concepts Holdings, Inc. and FX Concepts, LLC |
| **Maximum Borrowing Amount (DIP Note § 17)** | Multiple draw term loan not to exceed aggregate amount of $1.448 million, reduced by certain receivables as received. |

---

[2] This summary is intended only to assist the Court in understanding the key aspects of the arrangement and is qualified in its entirety by reference to the DIP Loan Documents. Capitalized terms used herein shall have the meanings given to them in the DIP Note.

| | |
|---|---|
| **Maximum Interim Borrowing** | $ 800,000 upon entry of the Interim Order ("Maximum Interim Borrowing") |
| **Interest Rate (DIP Note § 17)** | 6% per annum, plus an additional 2% upon an Event of Default. |
| **Commitment Fee** | None. |
| **Interest Payment Date** | At maturity or any pre-payments. |
| **Maturity Date (DIP Note § 17)** | January 31, 2014 |
| **Events of Default (DIP Note § 15)** | (a)    The Borrower (i) shall fail to make any payment of principal or interest on the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Lender for any expense reimbursable hereunder or under any other Loan Document at maturity.<br><br>(b)    Any Loan Party shall fail or neglect to perform, keep or observe any of the provisions of (i) Sections 12(b)(1), 12(b)(2), 13(b), 13(c), 13(h) or 14 of the Note, or (ii) Sections 12 (other than Sections 12(b)(1) and 12(b)(2)) or 13(a) of the Note and such failure shall remain uncured for a period of five (5) Business Days after the earlier of the date any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Lender to the Borrower.<br><br>(c)    Any Loan Party shall fail or neglect to perform, keep or observe any other provision of this Note or any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this Section 15) and the same, if capable of being remedied, shall remain unremedied for ten (10) Business Days after the earlier of the date such Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Lender to such Loan Party.<br><br>(d)    Any representation or warranty herein or in any other Loan Document or in any written statement, report, financial statement or certificate made or delivered to the Lender by any Loan Party is untrue or incorrect in any material respect as of the date when made or deemed made.<br><br>(e)    The occurrence of any postpetition judgments, liabilities or events that remain unabated and, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, as determined by the Lender in its sole discretion.<br><br>(f)    Any provision of any Loan Document shall for any reason |

cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the DIP Collateral purported to be covered thereby.

(g)    A Material Adverse Deviation shall occur without the Lender's consent.

(h)    The Borrower shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any subsidiary or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person.

(i)    The Final Order is not entered by the Court on or before November 27, 2013.

(j)    The occurrence of a Chapter 11 Event of Default, which constitutes an "Event of Default" if, or upon:

(1) the effective date of the Chapter 11 Plan;

(2) the consummation of the sale or other disposition of all or substantially all of the assets of the Borrower whether done by one or a series of transactions; that does not provide for the satisfaction in full in case (or by application of a credit bid) of the Obligations;

(3) immediately upon the Borrower's receipt of written notice from the Lender of the occurrence of any violation by the Borrower of an Interim Order or the Final Order (after expiration of the applicable Remedies Notice Period);

(4) the dismissal of the Chapter 11 Case or its conversion to a case under Chapter 7 of the Bankruptcy Code;

(5) the appointment of a trustee or an examiner with enlarged powers (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of the Borrower in the Chapter 11 Case without the prior written consent of the Lender (which consent may be withheld in the Lender's sole and absolute discretion), or the Borrower applies for, consents or fails to object to, or acquiesces in, any such appointment without the prior written consent of the

Lender (which consent may be withheld in the Lender's sole discretion);

(6) the stay, reversal, vacatur, amendment or other modification of, or supplement to, an Interim Order in any respect without the Lender's prior written consent;

(7) the filing of a motion in the Chapter 11 Case without the prior written consent of the Lender: (A) to obtain financing under section 364 of the Bankruptcy Code from any persons or entities other than the Lender; (B) to grant to any person or entity other than the Lender a lien or security interest affecting any DIP Collateral; (C) to recover from any portion of the DIP Collateral any costs or expenses of preserving or disposing of such collateral under section 506(c) of the Bankruptcy Code or (D) to authorize any action or actions adverse to the Lender, or its rights and remedies hereunder, under the Loan Documents or the Lender's interest in the DIP Collateral;

(8) the entry of an order in the Chapter 11 Case confirming any Chapter 11 Plan that does not contain a provision for (A) the termination of the Lender's commitment to make the Term Loans, and (B) the indefeasible payment in full in cash (or by application of a credit bid by Lender) of all Obligations, on or before the effective date of such plan;

(9) subject to the entry of the Final Order, except as permitted under an Interim Order, any proceeding is commenced seeking the invalidation, subordination, or other challenge (including validity, priority, enforceability or amount) to the Loan Documents, the Postpetition Liens, the Obligations or any other rights granted to the Lender under an Interim Order; or

(10) entry by the Bankruptcy Court or any other court of an order or judgment in the Chapter 11 Case modifying, limiting, subordinating or avoiding the priority of the Obligations, the obligations created herein, or the perfection, priority or validity of the DIP Superpriority Claim, the Postpetition Liens or, subject to entry of the Final Order, imposing, surcharging or assessing against the Lender or its claims or any collateral any costs or expenses, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise.

| | |
|---|---|
| **Conditions Precedent to Funding (DIP Note § 2)** | The Lender shall not be obligated to fund any Term Loan, if<br><br>(a)    the Borrower has not paid any amount then payable or has |

not performed any of its obligations under any other Loan Document;

(b)    any of the following conditions are not satisfied in a manner reasonably satisfactory to the Lender:

(1) Borrower shall have duly executed and delivered the Note;

(2) Borrower shall have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance reasonanly satisfactory to the Lender with respect to the Note and the other Loan Documents and the transactions contemplated hereby and thereby;

(3) Borrower shall have performed all of its obligations under any Loan Document;

(4) the Bankruptcy Court shall have entered the Interim Order;

(5) the Borrower shall have delivered to the Lender the Approved Budget that is in form and substance satisfactory in the Lender's sole discretion;

(6) the Lender shall have received evidence of insurance coverage with respect to the business and operations of the Borrower as the Lender may reasonably request;

(7) no Bankruptcy Court order has been entered (i) authorizing the Borrower to obtain financing or credit pursuant to section 364 of the Bankruptcy Code from any Person other than the Lender; or (ii) providing adequate protection to any Person;

(8) the Guarantors shall have delivered a continuing guaranty duly executed by the Guarantors with respect to the Obligations, in form and substance satisfactory to the Lender; and

(9) FX Concepts, LLC shall have filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the Southern District of New York, and such case shall have been procedurally consolidated with the case of the Borrower.

(c)    any representation or warranty by any Loan Party shall be untrue or incorrect as of such date in any material respect, except to the extent that such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be untrue or incorrect as of such earlier date);

| | |
|---|---|
| | (d)    (i) any Event of Default shall have occurred and be continuing or would result after giving effect to any Term Loan; or (ii) any Default shall have occurred and be continuing or would result after giving effect to any Term Loan, and the Lender shall have determined not to make any Term Loan so long as such Default is continuing; or <br><br>(e)    after giving effect to any Term Loan, the outstanding principal amount of all Term Loans would exceed the lesser of (i) the Maximum Amount, or (ii) the amount then authorized by an Interim Order or the Final Order, as applicable. |
| **Fees and Expenses (DIP Note § 19)** | Lender's out-of-pocket expenses incurred in connection with the negotiation and preparation of the Loan Documents and the obtaining of approval of the Loan Documents by the Bankruptcy Court, including expenses incurred in connection with any amendment of the Loan Documents, will be accrued and paid at maturity. |
| **Indemnity (DIP Note § 8)** | Each Loan Party shall jointly and severally indemnify the Lender and each of the Indemnified Persons against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements) that may be instituted or asserted against or incurred by the Lender or any such Indemnified Person in connection with the Note or as the result of credit having been extended, suspended or terminated under this Note and the other Loan Documents, provided that no Loan Party shall be liable for any indemnification to an Indemnified Person to the extent that such liability results solely from that Indemnified Person's gross negligence or willful misconduct. |
| **Other** | The Borrower shall appoint a Chief Restructuring Officer, which officer shall be reasonably acceptable to the Lender (it being agreed that Michael Meenan of CDG Group LLC is acceptable to Lender).  (DIP Note § 13(j)). |

24.    To secure the DIP Obligations, the Debtors propose to grant to AMF (i) Postpetition Liens in the DIP Collateral, subject only to (a) the Permitted Priority Encumbrances (as defined in the DIP Note) and, (b) upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Note), payment of the Carve-Out; and (ii) a DIP Superpriority Claim pursuant to § 364(c)(1) of the Bankruptcy Code in this Chapter 11 case and in any

Successor Cases for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, payable from and having recourse to all pre- and postpetition property of the Debtors and all proceeds thereof including, without limitation, and subject to entry of an order of this Court, the Avoidance Actions. The DIP Superpriority Claim will be subordinate in priority of payment only to, payments, if any, on account of Permitted Priority Encumbrances, and during the occurrence and continuance of an Event of Default, payment of the Carve-Out expenses. The Debtors have agreed that they will neither grant nor allow in this Chapter 11 case any other superpriority claims without AMF's consent (which consent may be withheld in AMF's sole and absolute discretion).

Budget

25.    The Debtors have delivered to AMF a detailed budget that sets forth projected cash disbursements (by line item) on a weekly basis for the time period from and including the Petition Date through January 3, 2014, a copy of which is attached to the proposed Interim Order as Exhibit A (as the same may be amended, modified, supplemented or replaced with AMF's written consent (which consent may be withheld in AMF's sole and absolute discretion), and in accordance with any Interim Order or Final Order and the DIP Loan Documents, the "Budget").

26.    If the aggregate disbursements by the Debtors from the initial date of the Budget exceeds the Budget by $75,000 or more in the aggregate, such Material Adverse Deviation (as defined in the DIP Note) shall constitute an Event of Default under the DIP Note. AMF will have the right but not the obligation to make advances or extend credit independent of any Budget line item restrictions on loan availability set forth in the DIP Loan Documents.

27.    Prior to an Event of Default, one-hundred (100%) percent of all collections on, and proceeds of the DIP Collateral, including, but not limited to, proceeds of sales

of inventory, fixed assets, and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which at any time on or after the Petition Date come into the possession or control of the Debtors, or to which the Debtors become entitled to at any time, but expressly excluding accounts receivable and a tax return that has been specifically identified and included in the Budget, are to be applied in accordance with the waterfall set forth in Paragraph 5 of the DIP Note and such payments will not be subject to disgorgement (but in any event, will remain proceeds of DIP Collateral). To the extent that the Debtors require additional funds to operate their business, they will request advances under the DIP Facility.

Carve-Out

28.     The Postpetition Liens and the DIP Superpriority Claim will be subject only to: (i) fees payable to the UST pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "Case Administration Fees"), (ii) unpaid professional fees and expenses ("Professional Fees") payable to any legal or financial advisors retained by the Debtors or any Committee that are incurred or accrued prior to the date of the occurrence of an Event of Default, but only as and to the extent such Professional Fees are or have been provided for in the Budget and are ultimately allowed by the Court pursuant to section 330 of the Bankruptcy Code, (iii) unpaid Professional Fees incurred or accrued on or after the date of the occurrence of an Event of Default in an aggregate amount not to exceed $20,000 and (iv) the costs of the claims and noticing agent, if any (subject to the terms of its retention order and the Budget) (the items in (i), (ii), (iii) and (iv) being, collectively, the "Carve-Out").

Restriction on Use of Funds

29.     The DIP Loan Documents provide that no proceeds from the DIP Loans or DIP Collateral, or proceeds thereof, or any portion of the Carve-Out may be used by the Debtors, any Committee, and/or any trustee appointed in these Chapter 11 cases, or any other person,

party or entity to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from AMF; (b) assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, or other contested matter seeking any order, judgment, determination or similar relief against AMF or any of its respective officers, designees, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action in connection with the DIP Facility, including, without limitation, (i) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code against AMF; (ii) any action relating to any act, omission or aspect of the relationship between AMF and FX or any of its affiliates; (iii) any action with respect to the validity and extent of the DIP Obligations; and/or (iv) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) AMF in respect of its liens and security interests in the DIP Collateral; and/or (c) pay any Claim of a creditor (as such term are defined in the Bankruptcy Code) without the prior written consent of AMF.

## **BASIS FOR RELIEF REQUESTED**

30.    The Debtors assert that the Court should grant the Motion because the Debtors' postpetition working capital needs can be satisfied only if the Debtors are authorized to borrow under the DIP Facility to fund their operations. The credit provided by the DIP Facility will enable the Debtors to maximize and preserve asset value during the orderly wind-down of their business, and to pay their administrative expenses in the ordinary course of business, thereby preserving and enhancing the value of the Debtors' assets for the benefit of their creditors.

Approval of Postpetition Liens and DIP Superpriority Claim

31.    To obtain postpetition credit under section 364(c) of the Bankruptcy Code,
the Court must find, after notice and a hearing, that the debtor in possession is "unable to obtain
unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an
administrative expense." 11 U.S.C. § 364(c); *see also In re Garland Corp.*, 6 B.R. 456, 461 (1st
Cir. BAP 1980) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized,
after notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re Crouse
Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa.), *modified on other grounds*, 75 B.R. 553 (Bankr.
E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must
prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy
Code).

32.    To show that the credit required is not obtainable on an unsecured basis, a
debtor need only demonstrate "by a good faith effort that credit was not available" without the
protections afforded to potential lenders by sections 364(c) and 364(d) of the Bankruptcy Code.
*Bray v. Shenandoah Federal Savings & Loan Assn. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088
(4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender
before concluding that such credit is unavailable." *Id.* at 1088. When few lenders are likely to
be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and
unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky
Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savings Bank
FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

33.    As set forth in the Affidavit of Robert Savage, pursuant to Local Rule
1007-2, sworn to the 21st day of October 2013 (the "Savage Affidavit"), and as the evidence at

the Interim Hearing and the Final Hearing will demonstrate, the Debtors could not obtain a postpetition financing facility on an unsecured basis. This conclusion was confirmed when the Debtors sought post-petition financing from various sources before the commencement of this case, and none of those potential lenders expressed an interest in providing such financing.

34.    The Debtors' efforts to seek postpetition financing from AMF satisfy the statutory requirements of sections 364(c) and 364(d) of the Bankruptcy Code. *See, e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor "must make an effort to obtain credit without priming a senior lien"); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (requiring demonstration that less onerous financing was unavailable). *See also In re Phoenix Steel Corp.*, 39 B.R. 218, 222 and n.9 (D. Del. 1984) (same).

35.    Here, the Debtors have demonstrated their inability to obtain financing on less onerous terms. Furthermore, it is unlikely that the Debtors could obtain financing from any other source on <u>any</u> terms at all, in light the current condition of the Debtors' businesses. For example, the DIP Loan Documents provide for interest to be payable at an annual interest rate of six percent (6.0%) per annum, a rate that is significantly lower than the average market interest rate for debtor-in-possession loans. Additionally, the financing provided by AMF does not require any commitment, facility, closing, unused line or similar fees to be paid by the Debtors to the Lender, also an anomaly in the world of debtor-in-possession financing. For the foregoing reasons, the Debtors submit that credit on an unsecured basis is unavailable, the DIP Facility is necessary to preserve and enhance the Debtors' estates, and that the terms of the DIP Loan Documents are fair, reasonable and appropriate, and proposed in good faith.

Application of the Business Judgment Standard

36.    As described above, after appropriate investigation and analysis, the Debtors' management have concluded that the proposed financing pursuant to the DIP Loan Documents is the best alternative available in the circumstances of this case.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *In re TM Carlton House Partners, LTD*, 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code").  In fact, "[m]ore exacting scrutiny would slow the administration of [the debtor's] estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

37.    The Debtors have exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Loan Documents.  The terms of the DIP Loan Documents are fair and reasonable

and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the DIP Loan Documents and obtain funds from AMF on the secured, administrative "superpriority" basis described above.

Good Faith

38.    The terms of the DIP Loan Documents, including the interest rates, applicable fees and intangible factors, are more favorable to the Debtors than those available from alternative sources. The DIP Loan Documents have been negotiated in good faith and at arm's-length between the Debtors and AMF.

Request for Modification of the Automatic Stay

39.    The DIP Loan Documents contemplate a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit AMF, in its sole discretion, to: (a) file necessary or appropriate documents to perfect the security interests and liens granted in respect of the DIP Loan Documents; and (b) upon the occurrence of an Event of Default under the DIP Loan Documents, subject in certain instances to the Remedies Notice Period: (i) terminate the commitments under the DIP Loan Documents, (ii) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Loan Documents, (iii) declare all DIP Obligations immediately due and payable, and/or (iv) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; provided, however, that immediately upon the occurrence of an Event of Default or a default by the Debtors of any of their obligations under this Interim Order or the DIP Loan Documents, AMF may charge interest at the default rate set forth in the DIP Note without being subject to the Remedies Notice Period. Upon the occurrence and during the continuance of an Event of Default, AMF will also have no further obligation to provide financing under the DIP Loan Documents.

40.    Stay modification provisions of this type are customary features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Loan Documents.

Extraordinary Provisions Under Guidelines

41.    The Debtors believe that all of the significant "extraordinary" provisions of the DIP Loan Documents and in the relief set forth in the attached Interim Order not already set forth above, are set forth in Annex 1 attached to the Interim Order, pursuant to the Guidelines for Financing Requests adopted by this Court pursuant to General Order No. M-274 dated September 9, 2002 (the "Guidelines").

42.    Given the facts and circumstances of this case, including, without limitation, the Debtors' dire need for operating capital and inability to obtain other financing, there is justification for these terms.

Interim Approval of the DIP Loan Documents Should be Granted

43.    A final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  However, under Bankruptcy Rule 4001(c)(2), the bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

44.    In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Simasko*, 47 B.R. at 449; *see also In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990). After the 14-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business, and the debtor is entitled to borrow those amounts

that it believes prudent in the operation of its business. *See, e.g., Simasko*, 47 B.R. at 449; *Ames*, 115 B.R. at 36.

45.     Pursuant to Bankruptcy Rule 4001(c), the Debtors request that this Court conduct a preliminary expedited hearing on this Motion to permit them to borrow up to the Maximum Interim Borrowing on an interim basis to the extent necessary to maintain the ongoing operations and activities of the Debtors and avoid immediate and irreparable harm and prejudice to the Debtors' estates.

46.     The use of new credit provided under the DIP Loan Documents will enable the Debtors to continue to operate in the normal course of their businesses and pay their administrative expense obligations in these Chapter 11 cases, thereby enhancing the value of their estates for the benefit of their creditors. The Debtors have an immediate and urgent need for the cash requested, absent which, pending the Final Hearing, irreparable harm will occur— the immediate shutdown of the Debtors' operations.

47.     As discussed above, the Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations. Moreover, the Debtors have been unable to obtain postpetition financing on terms more favorable than those proposed under the DIP Loan Documents. Under these circumstances, the granting of the relief requested herein is necessary and appropriate.

48.     Accordingly, for the reasons set forth above, the Debtors request that this Court grant the Motion.

## NOTICE

49.    Notice of this Motion has been given via e-mail, facsimile, telephone, and/or hand delivery, as appropriate, to the United States Trustee, each of the Debtors' 20 largest general unsecured creditors, Asset Management Finance LLC, the United States Attorney General, the Securities and Exchange Commission and the Internal Revenue Service.    The Debtors submit that no other or further notice need be given under the circumstances.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Debtors respectfully requests that this Court grant the Motion, and grant such other relief as the Court deems just and proper.

Dated: October 21, 2013
Stamford, Connectcut

By: /s/ Henry P. Baer, Jr.
    Henry P. Baer, Jr.
    Tony Miodonka
    FINN DIXON & HERLING LLP
    177 Broad Street
    Stamford, CT  06901-2689
    Tel.:  (203) 325-5000
    Fax:  (203) 325-5001

    *Proposed Counsel to Debtors*