**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>INTERNATIONAL FOREIGN EXCHANGE<br>CONCEPTS HOLDINGS, INC., et al.<br><br>     Debtors. | Chapter 11<br><br>Case No. 13-13379 (REG)<br><br>Jointly Administered |

**FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE**
**FIRST AMENDED LIQUIDATING PLAN OF INTERNATIONAL FOREIGN**
**EXCHANGE CONCEPTS HOLDINGS, INC., INTERNATIONAL**
**FOREIGN EXCHANGE CONCEPTS, L.P. AND FX CONCEPTS, LLC**

Henry P. Baer, Jr.
Tony Miodonka
**FINN DIXON & HERLING LLP**
177 Broad Street
Stamford, Connecticut  06901
Telephone:   (203) 325-5000
Facsimile:   (203) 325-5001

*Counsel to Debtors*

Dated: December 18, 2014

# I.    INTRODUCTION[1]

Pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), International Foreign Exchange Concepts Holdings, Inc. ("**IFEC Holdings**"), International Foreign Exchange Concepts, L.P. ("**IFEC LP**") and FX Concepts, LLC ("**FXC**," and together with IFEC Holdings and IFEC LP, the "**Debtors**") provide this disclosure statement (the "**Disclosure Statement**") to all of the Debtors' known creditors and parties in interest.

The purpose of this Disclosure Statement is to provide the information deemed necessary for creditors to make an informed decision in exercising their rights to vote on the *First Amended Liquidating Plan of International Foreign Exchange Concepts Holdings, Inc., International Foreign Exchange Concepts, L.P. and FX Concepts, LLC* (the "**Plan**"), dated as of the date of this Disclosure Statement.  The Debtors have filed the Plan simultaneously with the filing of this Disclosure Statement.  The description of the Plan in this Disclosure Statement is in summary form and is qualified by reference to the actual terms and conditions of the Plan, which should be reviewed carefully before making a decision to accept or reject the Plan.  If there is any inconsistency between the Plan and the Disclosure Statement, the terms of the Plan govern.

The information contained in this Disclosure Statement has been provided by the Debtors based upon an analysis and investigation of their records, businesses and affairs.  Except as otherwise expressly indicated, such information has not been subject to audit or independent review.  Although great effort has been made to be accurate, neither the Debtors nor their respective professional advisors warrant the accuracy of the information contained in this Disclosure Statement.

No representations concerning the Debtors, including representations concerning the value of their assets or the aggregate dollar amount of Claims which may be allowed, are authorized other than as set forth in this Disclosure Statement.  Any statements, representations or warranties made in connection with the Plan that differ from those contained in this Disclosure Statement should not be relied upon in voting on the Plan.

Any descriptions of legal principles contained in this Disclosure Statement do not constitute a legal opinion and may not be relied upon by any creditor or party in interest.  Each creditor or party in interest should consult its own legal advisors with respect to any legal principles described in this Disclosure Statement.

This Disclosure Statement has been prepared by the Debtors to provide creditors with adequate information so that they can make an informed judgment about the Plan.  Each creditor should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.  No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtors' businesses or assets other than the information contained in this Disclosure Statement.

---

[1]    Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

The Debtors believe that the Plan provides the quickest recovery to creditors and will maximize their return. In addition, AMF-FXC Finance, LLC ("**AMF**"), which has asserted claims for approximately $34 million against each of IFEC Holdings and IFEC LP (approximately 95% of all claims against each such entity), similarly believes the Plan is reasonable, appropriate, and will maximize recovery for all constituencies. **ACCORDINGLY, THE DEBTORS URGE ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

## II.    SUMMARY OF THE PLAN

The Plan is a liquidating plan, and provides for the separate treatment of each of the Debtors' Estates. As a result of substantial negotiations with AMF, the Plan contemplates that all creditors other than AMF who hold allowed general unsecured claims will be paid on, or as soon as reasonably practicable after, the Effective Date of the Plan (i) in the IFEC LP bankruptcy case, cash in an amount equal to 50% of such claims, and (ii) in the IFEC Holdings bankruptcy case, cash in an amount equal to 10% of such claims. The Plan contemplates that FXC creditors will be paid in full in cash. AMF will receive the remaining net proceeds of the IFEC Holdings and IFEC LP Assets, which are currently estimated to be cash in an amount equal to approximately 10% to 16% of AMF's claims as of the Effective Date, plus rights to receive certain payments in the future, if any.

The Debtors believe this distribution structure provides a substantial benefit to general unsecured creditors because such creditors receive cash on (or soon after) the Effective Date that has a potentially greater present value than does the projected future recovery on remaining assets. In contrast, AMF will receive payment on its claims over time and will incur all of the risk associated with future distributions, which may not be received for up to 4 years (and may not be received at all). Critically, these potential future recoveries are subject to significant risk as they largely depend on events beyond the control of the Debtors, including the approval and successful production, marketing, and sales of a biopharmaceutical that is being developed by a third party.

The Plan contemplates that Michael Meenan, of CDG Group LLC, will be appointed and will serve as the liquidating trustee (the "**Liquidating Trustee**") for the liquidating trust established by the Plan (the "**Liquidating Trust**"). The Liquidating Trustee will be responsible for, among other things, administering the Assets (defined below) and preparing, filing and resolving the Debtors' final tax returns. The Liquidating Trustee will also be responsible for liquidating the remaining assets, closing out foreign and domestic affiliates (and addressing all regulatory, financial, and legal issues), making distributions to holders of as-yet unsatisfied Allowed Claims, if any, in accordance with the Plan, investigating and potentially pursuing Causes of Action, objecting to Disputed Claims asserted against the Debtors, and winding up the Debtors' affairs and businesses.

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan. This summary is qualified in its entirety by reference to the Plan, a copy of which is attached hereto as **Exhibit A**. For a more detailed description of the terms and provisions of the Plan, see Section VII below entitled "Description of the Plan." The "estimated recovery" for AMF as set forth below is based, at least in part, on certain assumptions, which are discussed more fully below, with respect to the identification and prosecution of objections to

claims, the expected final allowed amount of disputed claims, and the potential eventual recovery on certain remaining assets. In addition, AMF's "estimated recovery" is based on a review of the Debtors' respective books and records by the Debtors' chief restructuring officer. No representations can be or are made with respect to whether the estimated percentage recovery for AMF shown in the table below will actually be realized by AMF.

Subject to the above, the Debtors currently estimate recoveries to be as follows:

| Class | Description | Treatment | Estimated Recovery[2] |
|---|---|---|---|
| N/A | Administrative | Unimpaired | 100% |
| N/A | Priority Tax | Unimpaired | 100% |
| 1 | Priority | Unimpaired | 100% |
| 2 | Secured | Unimpaired | 100% |
| 3A | GUC Against IFEC Holdings | Impaired: In full and complete satisfaction, settlement, and release of their respective Allowed IFEC Holdings General Unsecured Claims, each holder of an Allowed IFEC Holdings General Unsecured Claim (other than an Intercompany Claim) shall receive a cash payment equal to 10% of its Allowed IFEC Holdings General Unsecured Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) five business days after such Claim becomes an Allowed IFEC Holdings General Unsecured Claim. | 10% |
| 3B | GUC Against IFEC LP | Impaired: In full and complete satisfaction, settlement, and release of their respective Allowed IFEC LP General Unsecured Claims (other than an Intercompany Claim), each holder of an Allowed IFEC LP General Unsecured Claim shall receive a cash payment equal to 50% of its Allowed IFEC LP General Unsecured Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) five business days after such Claim becomes an Allowed IFEC LP General Unsecured Claim. | 50% |
| 3C | GUC Against FXC | Unimpaired: In full and complete satisfaction, settlement, and release of their respective Allowed FXC General Unsecured Claims, each holder of an Allowed FXC General Unsecured Claim shall receive, on, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) five business days after the date on which such Claim becomes an Allowed FXC General Unsecured Claim, (1) cash in an amount equal to its Allowed FXC General Unsecured Claim, and (2) interest on | 100% |

---

[2] Adjusted to reflect present value of potential expected distributions.

| | | account of such FXC General Unsecured Claim at the Plan Interest Rate, calculated from the Petition Date through the date upon which such Allowed FXC General Unsecured Claim is paid. | |
|---|---|---|---|
| 3D | AMF Claims Against IFEC Holdings and IFEC LP | Impaired:  In full and complete satisfaction, settlement, and release of its Allowed AMF Claim, AMF shall receive the Net Proceeds of the IFEC Holdings and IFEC LP Assets, after payment or reserve for payment of any Allowed Administrative Expense Claims allocable to IFEC Holdings or IFEC LP, Priority Claims allocable to IFEC Holdings or IFEC LP, Priority Tax Claims allocable to IFEC Holdings or IFEC LP, IFEC Holdings General Unsecured Claims and IFEC LP General Unsecured Claims as set forth in the Plan. | 10% -- 48% |
| 4A | Equity Interest in IFEC Holdings | Impaired:  Holders of Equity interests in IFEC Holdings will receive nothing under the Plan. | 0% |
| 4B | Partnership Interest in IFEC LP | Impaired:  Holders of Partnership interests in IFEC LP will receive nothing under the Plan. | 0% |
| 4C | Membership Interest in FXC | Impaired:  In full and complete satisfaction, settlement, and release of the FXC Equity Interests, the Net Proceeds of the FXC Assets, after payment or reserve for payment of any Allowed Administrative Expense Claims allocable to FXC, Priority Claims allocable to FXC, Priority Tax Claims allocable to FXC, and FXC General Unsecured Claims, all additional Proceeds of the FXC Assets will distributed to IFEC LP as the sole equity holder of FXC, and shall be considered part of the IFEC LP Assets hereunder. | N/A |

ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERY SET FORTH ABOVE FOR AMF IS REASONABLE AND WITHIN THE RANGE OF LIKELY RESULTS, THERE IS NO ASSURANCE THAT THE ACTUAL PERCENTAGE RECOVERY WILL BE AS PROJECTED.  ACTUAL RECOVERY MAY SIGNIFICANTLY VARY FROM THE ESTIMATE ABOVE.  The actual recovery under the Plan by AMF will depend upon a variety of factors including, but not limited to, whether, and in what amount, contingent claims against each of the Debtors become non-contingent and fixed, whether and to what extent Disputed Claims are resolved in favor of the Debtors, and whether and to what extent additional Assets are monetized and collected.  Accordingly, no representation can be or is being made with respect to whether the estimated percentage recovery shown in the table above will actually be realized by AMF.

## III.    INFORMATION ABOUT THE REORGANIZATION PROCESS

### 3.1    Purpose of Disclosure Statement

This Disclosure Statement includes background information about the Debtors and also identifies the Classes into which creditors and equity holders have been placed by the Plan.  The Disclosure Statement describes the proposed treatment of each of those Classes if the Plan is confirmed.  In addition, this Disclosure Statement contains information concerning the prospects for creditors and equity holders in the event of confirmation or, in the alternative, the prospects if confirmation is denied or the proposed Plan does not become effective.

Upon approval by the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, this Disclosure Statement and any exhibits hereto will have been found to contain adequate information of a kind and in sufficient detail that would enable a reasonable, hypothetical investor typical of a holder of Impaired Claims to make an informed judgment about the Plan.  Approval of this Disclosure Statement by the Bankruptcy Court, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

### 3.2    Voting Procedure

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating, signing and causing the Ballot accompanying this Disclosure Statement to be returned to the following address in the enclosed envelope:

Logan & Company, Inc.
546 Valley Road
Upper Montclair, NJ  07043

Ballots must be completed in accordance with the instructions set forth therein and must be received at the address above **on or before 4:00 p.m. (Eastern Time) on January 26, 2015** to be counted in the voting.  Ballots received after this time will not be counted in the voting unless the Bankruptcy Court so orders.

The Debtors recommend a vote for "ACCEPTANCE" of the Plan.

### 3.3    Ballots

Accompanying this Disclosure Statement is a ballot for acceptance or rejection of the Plan (a "**Ballot**").  Each party in interest entitled to vote on the Plan will be sent a Ballot.  Classes 3A, 3B, 3D, and 4C are Impaired and may vote on the Plan (the holder of the Class 4C interest will not receive a Ballot because it is a proponent of the Plan and is voting in favor of the Plan).  Classes 1, 2, and 3C are not impaired under the Plan and are deemed to have accepted the Plan.  Classes 4A and 4B are not receiving any distribution under the Plan and are deemed to have rejected the Plan.  Each member of a voting Class will be asked to vote for acceptance or rejection of the Plan.  A party who holds claims in more than one Class should complete a Ballot for each Class with respect to the portion of its claim included in that Class.

5

### 3.4    The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on February 3, 2015, at 9:45 a.m., or as soon thereafter as the parties can be heard.  The Confirmation Hearing will be held before the Honorable Robert E. Gerber, United States Bankruptcy Judge, 5th Floor, United States Bankruptcy Court, One Bowling Green, New York, New York 10004-1408.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interests of holders of Claims and Equity Interests.  The Bankruptcy Court will also receive and consider a Report of Plan Voting prepared by the Debtors and their agents and summarizing the votes for acceptance or rejection of the Plan by the parties entitled to vote.

### 3.5    Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether each Impaired Class has accepted the Plan.  Under Section 1126 of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims of Class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.  Unless there is acceptance of the Plan by all members of an Impaired Class, the Bankruptcy Court must also determine that Class members will receive under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Class members would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

### 3.6    Confirmation of the Plan Without the Necessary Acceptances.

The Plan may be confirmed notwithstanding that one or more Impaired Classes have not accepted the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly against and is fair and equitable as to such Class or Classes.  This provision is set forth in Section 1129(b) of the Bankruptcy Code and requires that, among other things, either the class of Claims or Equity Interests must receive the full value of their Claims or Equity Interests or, if they receive less, no Class with junior distribution priority may receive or retain anything on account of such junior interest unless the junior class provides "new value" or other consideration to the Debtors.   The Debtors intend to proceed toward confirmation provided that at least one Impaired Class has voted to accept the Plan.  The Debtors reserve the right to seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code.

## IV.    GENERAL INFORMATION

### 4.1    Description of the Debtors

#### A.    General

IFEC Holdings and IFEC LP commenced these Chapter 11 cases by filing voluntary Chapter 11 petitions on October 17, 2013.  FXC followed suit by filing a voluntary Chapter 11 petition on October 23, 2013.  For the sake of simplicity, as used in this Disclosure Statement the term "**Petition Date**" shall refer to October 17, 2013.  The Debtors continue to operate as

debtors-in-possession and manage their remaining assets pursuant to Sections 1107 and 1108 of the Bankruptcy Code. IFEC Holdings is a Delaware corporation whose headquarters were located at 3 Park Avenue, 30th Floor, New York, New York 10016. IFEC LP, formerly known as International Foreign Exchange Concepts, Inc., is a New York limited partnership. FXC, formerly known as FX Concepts Holdings LLC and FX Concepts, Inc., is a New York limited liability company.

Headquartered in New York City, FX Concepts (as the overall business is widely known) was one of the world's leading independent providers of foreign currency management and research services. Founded in 1981, the firm began as an advisory firm specializing in quantitative currency forecasting and providing research to major corporate and bank treasuries actively managing currency risk. The firm began managing external capital in 1988, and at its peak the fund managed over $14 billion in investments. As recently as February, 2013, the firm reported assets under management of more than $1 billion.

FX Concepts managed currencies for institutional investors through overlay and absolute return programs, and employed a methodology integrating the study of cycles, quantitative model-building, and technical forecasting. In addition to its investment management operations, the firm published and sold research on foreign exchange, interest rates, equities and commodities as part of a separate business.

The entire business enterprise of FX Concepts consisted of 11 separate entities. Overseas operations were housed in FX Concepts (Asia Pacific) Ltd, FX Concepts (Switzerland) GmbH, FX Concepts (Singapore) Ltd., FX Concepts (Bermuda) Limited, FX Concepts (UK) Ltd., and FX Concepts (B.V.I.), each of which was directly or indirectly funded by FX Concepts (UK Holdings) Ltd. (together, the "**Overseas Companies**"). None of the Overseas Companies are debtors in these proceedings, and several have now initiated formal wind-down or insolvency proceedings in their respective jurisdictions.

In addition to IFEC Holdings and IFEC LP, the firm's domestic operations were conducted by FXC and FX Concepts Trading Advisor LLC. These entities functioned as investment managers and advisors for the various FX Concepts funds. FX Concepts Trading Advisor LLC is not a debtor in these proceedings, and has not otherwise initiated insolvency proceedings.

IFEC Holdings and IFEC LP are the ultimate direct and indirect parents of all other FX Concepts entities. IFEC LP holds all of the issued and outstanding equity interests in FX Concepts (UK Holdings) Ltd., FXC and FX Concepts Trading Advisors LLC. IFEC Holdings, in turn, is the general partner in IFEC LP.

The FX Concepts funds have been shut down and the investor funds (all of which were held in and managed by non-debtors) have been returned to investors. Other than as set forth below, there have been no allegations of misconduct, fraud, or mismanagement by any of the FX Concepts entities, employees or advisors, and other than ordinary course investment losses no investor funds have been lost.

## B.    Funding and Capital Structure

FX Concepts is entirely owned by IFEC LP, and IFEC Holdings is the General Partner of IFEC LP.  IFEC Holdings, in turn, is owned almost entirely by former employees.  John R. Taylor, Jr., the former Chairman and Founder of the firm, owns 47% of the shares (including shares held by his family trusts), Jonathan H. Clark owns 22% (including shares held by his family trusts), and Philip E. Simotas owns 15%, and the majority of remaining shareholders are former employees.

Although the Debtors have no secured debt, they financed their operations with unsecured debt.  Specifically, IFEC LP entered into a Note Purchase Agreement (the "**2006 NPA**"), dated as of November 28, 2006, with AMF and Asset Management Finance Corporation, as buyers.  As part of the 2006 NPA, IFEC LP issued a Revenue Share Note (as amended and restated in 2012, the "**2006 Revenue Share Note**"), dated as of November 28, 2006, in favor of AMF in the principal amount of $20 million.   In connection with the 2006 NPA and the 2006 Revenue Share Note, IFEC LP also issued a Make-Whole Promissory Note (as amended and restated in 2012, the "**2006 Make-Whole Note**"), dated as of November 28, 2006, in favor of AMF.  By its terms, the 2006 Make-Whole Note only becomes effective after certain specified events of default.

In June 2010, IFEC LP entered into a second Note Purchase Agreement (as amended, the "**2010 NPA**," and together with the 2006 NPA, the "**NPAs**"), dated as of June 7, 2010, with AMF and Asset Management Finance Corporation, as buyers.  As part of the 2010 NPA, IFEC LP issued another Revenue Share Note (as amended and restated in 2012, the "**2010 Revenue Share Note**," and together with the 2006 Revenue Share Note, the "**Revenue Shares Notes**"), dated as of June 7, 2010, in favor of AMF, and also in the principal amount of $20 million.   In connection with the 2010 NPA and the 2010 Revenue Share Note, IFEC LP also issued a Make-Whole Promissory Note (as amended and restated in 2012, the "**2010 Make-Whole Note**," and together with the 2006 Make-Whole Note, the "**Make-Whole Notes**"), dated as of June 7, 2010, in favor of AMF.  As is the case with the 2006 Make-Whole Note, the 2010 Make-Whole Note only becomes effective after certain specified events of default.  The NPAs, Revenue Share Notes, and Make-Whole Notes are collectively referred to herein as the "**Loan Documents**."

In 2012, as a result of their financial condition, the Debtors and AMF negotiated certain relief from the Debtors' obligations under the Loan Documents (the "**2012 Agreement**").  Among other things, the Debtors and AMF agreed that the Debtors would have the right to defer certain quarterly payments due to AMF under the Revenue Share Notes for up to 8 quarters.  In connection with the 2012 Agreement, John Taylor, the Chief Executive Officer and Founder of the Debtors, entered into a personal Guarantee, dated as of December 14, 2012, in favor of AMF, under which Mr. Taylor guaranteed the payment of any such deferred payments.  In connection with that personal guarantee, Mr. Taylor granted security interests to AMF to secure his obligations under the guarantee.

According to the Debtors' books and records, approximately $34 million was due under the Revenue Share Notes as of the Petition Date.  AMF asserted that the Make-Whole Notes were triggered (which, if true, would replace the Revenue Share Notes), but have not yet asserted a specific amount due thereunder.  AMF has, however, filed claims against IFEC Holdings and

IFEC LP, each in the amount of $34 million. Because AMF has already received over $7 million pursuant to the Taylor Settlement (as defined below), the Plan seeks to allow AMF's claims against the Debtors in the amount of approximately $26.7 million.

**C.     Events Leading to Bankruptcy**

The collapse of the Debtors' business is largely tied to the deterioration of the foreign currency market. According to a Wall Street Journal article, currency funds in general were down in 2013 for the third year in a row. According to that same article, "assets in hedge-fund strategies dedicated to currency trading have fallen to $21.6 billion, down nearly 50%" from its peak.

In connection with that global pullback in the market in general, the Debtors' performance lagged, and investors eventually began redeeming their investments. Although the Debtors worked for months to negotiate relief under their Loan Documents and to identify alternative business solutions upon which they could restructure business operations, those negotiations proved unsuccessful. The 'final straw' came in September, 2013, when the San Francisco City and County Employees' Retirement System gave notice that it was redeeming its investment in full. That investment made up almost 66% of the Debtors' total assets under management at that point, and the redemption proved fatal to the Debtors' business.

The Debtors have now terminated all operations and have wound down all of their businesses. They have terminated all employees, have auctioned off or otherwise disposed of their principal assets, and are currently in the process of liquidating any remaining assets, and minimizing claims against the respective estates.

**V.     SIGNIFICANT POST-PETITION EVENTS**

**5.1     General Information**

On October 17 and 23, 2013, respectively, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Upon motion of the Debtors, the Debtors' cases were procedurally consolidated and have been jointly administered. The Debtors continue to operate as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**5.2     No Appointment of Creditors' Committee**

A meeting of creditors was held on October 28, 2014, but no committee was appointed by the Office of the United States Trustee.

### 5.3    Consolidated Chapter 11 Cases

#### A.    First Day Pleadings

##### 1.    Postpetition Financing

Shortly after the petitions were filed, the Debtors entered into a debtor-in-possession financing agreement (the "**DIP Financing**") with AMF to ensure that the Debtors had adequate funding to meet their immediate and anticipated cash requirements at the outset of the cases. The DIP Financing originally provided for up to $1.448 million, an amount sufficient to maintain ongoing operations for a period of approximately four months. On October 23, 2013, the Court entered an order approving the DIP Financing facility on an interim basis and on November 20, 2013, the DIP Financing was approved on a final basis.

The DIP Financing was repaid in full on December 16, 2013 from proceeds of the Asset Sale (as defined below).

##### 2.    Retention of Professionals and First Day Affidavit

Shortly after filing their Chapter 11 petitions, the Debtors filed applications to retain: (a) Finn Dixon & Herling LLP ("**FDH**") as their general bankruptcy counsel; (b) Logan & Company, Inc. ("**Logan**") as their claims and noticing agent; (c) CDG Group, LLC ("**CDG**") to provide crisis management services and Michael Meenan as their chief restructuring officer (the "**CRO**"); (d) Withers Bergman LLP as special corporate counsel; and (e) DiConza Traurig LLP, now DiConza Traurig Kadish LLP ("**DTK**"), as conflicts counsel.

#### B.    Marketing and Sale of the Debtors' Principal Assets

One of the Debtors' main priorities following the commencement of their Chapter 11 cases was to quickly market and sell certain of their assets that had declining value, required significant resources to maintain in a saleable state, or had to be sold promptly in order to realize maximum value for such assets.  Any unnecessary delay in the sale of these assets (collectively, and as more fully defined below, the "**Assets**") could have resulted in a complete loss of value and/or a significant drain on the Debtors' remaining limited resources, irreparably harming the Debtors' estates and, consequently, their creditors' ultimate recovery.

By motion filed on November 1, 2013 (the "**Sale Motion**"), the Debtors sought the Court's authority to sell their principal assets at a public auction to be conducted in accordance with Court-approved bidding procedures (the "**Bidding Procedures**").  By order entered on November 4, 2013 (the "**Sale Procedures Order**"), the Court granted the Debtors authority to sell their principal assets at auction and approved the Bidding Procedures.

The Assets to be sold at the Auction (as defined below) consisted of: the Newsletter Business, the Models, the Historical Data and the FX Concepts Trademark (each as described and defined below).  The Assets were to be sold as either a consolidated enterprise or in four separate groups.  In addition, as described below, prospective purchasers were given the opportunity to acquire the Models as a whole, individually, or in one or more lots.

1.      **The Assets**

(a)      The Newsletter Business

For the past 32 years, the Debtors have published, marketed and distributed newsletters (the "**Newsletter Business**") to industry professionals providing specialized analysis and insights related to foreign exchange, interest rates, global equity indices and commodities through a series of models, trades and portfolios.  Prior to its sale, the Newsletter Business was owned by IFEC LP.  The assets comprising the Newsletter Business included:

- The revenue and accounts receivable as they stood on October 31, 2013, net of liabilities, generated by publishing the daily newsletters;

- The prospect list, the history of sales, and the Wednesday free mailing list;

- The option to engage the services of John Taylor, Jonathan Clark and Joe Palmisano, writers of the newsletters (by separate agreement, with such person's consent); and

- The name "FX Concepts Newsletter" as it applies to the Newsletter and the written research product embodied in the Newsletters.

In addition to the FX Concepts Newsletter Business, the Debtors also sought to sell Thoughtful Research, Track.com, and Track Research (each as defined below), which also provided a newsletter to industry participants on a subscription basis.

(b)      The Computer Models

The Company's computer models (the "**Models**") were developed and generated over many years to analyze, quantify and respond to market movements.  The Models were owned by FX Concepts.  These Models were developed by programmers working with experienced currency managers to interpret market signals and react based on a series of strategies.  As part of the Debtors' marketing efforts, these strategies were generally grouped into five major programs: Global Currency Program, Multi-Strategy Fund, Global Financial Markets, Pure Beta Plus and Volatility Program (each a "**Program**" and collectively the "**Programs**").

Each Program focused on a different component of the trading environment.  In operation, funds can be allocated between Programs based on the comprehensive feedback from all Models.  Certain market environments may encourage an increased asset allocation to specific Programs.

The ability to execute trades quickly at high volume was a unique strength of the Debtors' strategy.  The Debtors' execution engine, coupled with the "**Intra-day Model Overlay**" (a program that allows for real-time monitoring of market prices and activity and allows for execution via the execution system), are able to analyze and react to market movements by buying or selling currencies quickly based on historical patterns combined with assessment of unique real-time market forces.

(c)    The Historical Data

Over the course of their thirty-two years in the foreign exchange industry, the Debtors accumulated significant archival trading data, including currency trading values from a variety of sources (the "**Historical Data**"). The Historical Data, collected by the Debtors, represents an insightful view of trading values relative to the market, and the combination of trading history values, volume and institutions serves as a valuable tool in currency research and analysis.

(d)    Use of the Trademark

The Debtors' service mark FX CONCEPTS (the "**Trademark**") had been used by the Debtors since 1981. The Trademark was registered with the U.S. Patent and Trademark Office on July 27, 1999, and the registration was valid and in good standing. The Trademark was registered in connection with foreign currency trading and advices, financial information in the nature of rates of exchange, and financial management.

**2.    The Debtors' Marketing Efforts**

To market the Assets effectively and efficiently identify and solicit potential purchasers, CDG developed marketing materials including an overview of assets to be sold and a 57-page detailed description of those assets (collectively, the "**Marketing Materials**").

Prior to November 1, 2013, potential purchasers who had previously reached out to the Debtors and expressed interest in any of the Assets were contacted by CDG. On November 1, 2013, the Marketing Materials were distributed to such entities and individuals. In addition, starting on November 1, 2013, phone calls were made to over forty parties who were identified as potential purchasers based on the type of investment funds operated by such entities and the potential synergies between such parties' businesses and the Assets.

In total, forty-nine potential purchasers requested and were provided with the Marketing Materials. Approximately seventeen of these parties responded with additional questions and to arrange due diligence. As the marketing process developed, it became clear that the Debtors could most effectively package the Models in three separate lots, which were referred to as the "**Intraday Model**," the "**Volatility Model**," and all "**Remaining Models**."

As a result of these marketing efforts, On November 1, 2013 the Debtors received bids from Aktis Capital Advisory Limited (the "**Stalking Horse**") for certain of the Debtors' Assets in the following amounts:

- Total bid for the Models, including associated hardware: $1,000,000;

- Total bid for the Historical Data: $200,000; and

- Total bid for the use of the Trademark: $250,000.

Each such bid (collectively, the "**Stalking Horse Bid**") was a binding, independent bid for the corresponding Asset(s). The Stalking Horse Bid, which was approved by the Court in the Sale Procedures Order, was not contingent on the Stalking Horse receiving a break-up fee,

expense reimbursement, or other unique or extraordinary bid protections, nor were any such protections granted by the Debtors to the Stalking Horse.

In addition to the Stalking Horse Bid, prior to the Auction the Debtors received binding bids from five different entities for one or more of the Assets, broken down as follows: five bids for one or more of the lots of the Models, two bids for the Historical Data, and one bid for the FX Concepts trademark.

3.    **The Auction**

In accordance with the Sale Motion and the Sale Procedures Order, the Debtors held an auction for the Assets on November 25, 2013 (the "**Auction**").  The auction for the Newsletter Business was adjourned, and a sale of the Newsletter Business was later consummated as part of the Taylor Settlement (as defined below).

The Auction was administered by the Debtors' CRO, with the assistance of the Debtors' counsel, and in consultation with AMF.  Four bidders were present at the Auction (each an "**Auction Participant**" and collectively the "**Auction Participants**"), while the fifth bidder rested on its opening bid and declined to participate at the Auction.

Prior to the commencement of the Auction each bidder acknowledged and represented on the record:

- that it understood that the Auction would be conducted according the Court-approved Bidding Procedures;

- that it was participating in the Auction in good faith and without any collusion or other improper influence; and

- whether and to what extent such bidder had any preexisting connection to or association with the Debtors or any employee of the Debtors.

All Auction Participants were informed, prior to the commencement of bidding and on the record, that the Assets would be auctioned in six separate lots (the three lots of Models, the Historical Data, the Trademark, and the Hardware), followed by another round of bidding during which each Auction Participant would have the opportunity to submit an overbid for all of the assets together (the "**Aggregate Bid**").  The Auction Participants were also informed, prior to the commencement of bidding, that certain of the Debtors' insiders might submit bids for one or more of the Assets, but that such insiders would not participate in the auction in any other capacity, including but not limited to the consideration of any other bids or the qualification of any other bidders.

The bidding order, starting bids and bid increments for each of the Assets were announced at the beginning of the Auction as follows:

| Asset | Starting Bid | Bid Increments |
|---|---|---|
| 1.  Remaining Models | $250,000 | $25,000 |
| 2.  Volatility Model | $200,000 | $20,000 |
| 3.  Intraday Model | $550,000 | $50,000 |
| 4.  Hardware | $100,000 | $20,000 |
| 5.  Historical Data | $250,000 | $25,000 |
| 6.  FX Concepts Trademark | $250,000 | $25,000 |

The bids for each of the assets was follows:

- Remaining Models.  There were twenty-six total bids for the Remaining Models. The highest bid for the Remaining Models was $900,000.

- Volatility Model.  There were eighteen total bids for the Volatility Model.  The highest bid for the Volatility Model was $560,000.

- Intraday Model.  There were fourteen total bids for the Intraday Model.  The highest bid for the Intraday Model was $1.3 million.

- The Hardware.  There were two total bids for the Hardware.  The highest bid for the Hardware was $120,000.

- The Historical Data.  There was one bid for the Historical Data in addition to the Stalking Horse Bid.  That bid was $250,000, which was the highest bid offered for the Historical Data.

- The FX Concepts Trademark.  There were no additional bids for the FX Concepts Trademark.  The stalking horse bid for the FX Concepts Trademark was therefore the highest bid at $250,000.

The aggregate of the highest bids for each of the six individual lots of Assets totaled $3.38 million.  At the conclusion of the bidding for the six individual lots of Assets, the CRO offered each Auction Participant the opportunity to submit an Aggregate Bid, beginning at $3.48 million and proceeding with bid increments of $100,000.  A total of thirty-nine Aggregate Bids were received, with the highest Aggregate Bid submitted by Ruby Commodities, Inc. ("**Ruby**") totaling $7.48 million.

At the conclusion of the auction, the CRO, in consultation with AMF and the Debtors' counsel, selected Ruby as the Successful Bidder, with an Aggregate Bid for the six lots of Assets totaling $7.48 million.  In addition, the CRO, in consultation with AMF and the Debtors'

counsel, selected Aktis Capital Management Limited ("**Aktis**") as the Backup Bidder, with an Aggregate Bid for all of the auctioned Assets totaling $7.38 million.

These selections were made in good faith, without collusion or improper influence, and based solely on the best interests of the Debtors' estates and that of their creditors. Each of the transactions contemplated with each of these bidders would be an arms-length transaction, negotiated and consummated in good faith.

### 4.    Approval of the Asset Sale

The Bankruptcy Court entered an order approving the sale of the Assets (excluding the Newsletter Business) to Ruby on November 26, 2013, and the sale closed on December 2, 2013. Pursuant to the terms of the Asset Purchase Agreement, Ruby agreed to pay, and did pay, a total of $7.48 million for the purchased Assets. After receiving Ruby's initial good faith deposit of $160,000 on November 22, 2013, the Debtors received the remainder of the consideration by wire transfer on December 3, 2013.

As discussed in more detail below (see Sections 6.1, below), the FX Concepts Newsletter was sold to John Taylor as part of the Taylor Settlement [Docket No. 283], and Track.com (and related entities) was sold to Robert Savage [Docket No. 300].

### C.    The Debtors' Lease

On November 12, 2010, the Debtors entered into a certain Indenture of Lease (the "**Lease**") for their principal business premises located at 3 Park Avenue, 30th Floor, New York, New York (the "**Premises**"). The Debtors' landlord under the Lease was Three Park Avenue Co., L.P. (the "**Landlord**").

### 1.    The Letter of Credit Stipulation

As security for the Debtors' obligations under the Lease, IFEC LP gave the Landlord an unconditional irrevocable standby letter of credit issued by JP Morgan Chase, N.A. ("**JPM**") in the maximum amount of $690,000 (the "**Letter of Credit**"). The Letter of Credit was governed by a certain Application and Agreement for Irrevocable Standby Letter of Credit, dated November 5, 2010 (the "**L/C Agreement**"). Under the terms of the Lease, the Landlord was entitled to draw on the Letter of Credit after an event of default under the Lease.

To secure the obligations under the L/C Agreement, IFEC LP granted to JPM a security interest in funds deposited with JPM in the amount of $703,800, which deposit amounted to, as of October 17, 2013, approximately $705,960.06 (the "**Cash Collateral**"). To perfect its interest in the Cash Collateral, JPM maintained the Cash Collateral in a segregated account at JPM pursuant to the L/C Agreement and the Assignment of Deposit Account Agreement dated as of November 4, 2010.

On or about October 15, 2013, the Landlord submitted a request to draw the full amount of $690,000 (the "**Draw Request**") on the Letter of Credit due to the Debtors' alleged failure to pay rent for October 2013. On or about October 24, 2013, JPM honored the Draw Request and transferred the sum of $690,000 to the Landlord, pursuant to the Draw Request (the "**Draw**

**Proceeds**").  Although the Debtors had some concerns about the propriety of the Landlord's Draw Request, the Debtors determined to enter into a stipulation with JPM and sought an order lifting the automatic stay to permit JPM to set off the Cash Collateral and irrevocably apply it to satisfy the obligations under the L/C Agreement.  The Court entered this order on December 18, 2013.

## 2.    Agreement with the Landlord

After receiving the Draw Proceeds, on November 13, 2013 the Landlord filed a motion seeking an order (I)(A) Compelling the Debtors to Pay Post-Petition Rent, or (B) Lifting the Automatic Stay to Permit the Landlord to Terminate the Debtors' Lease; (II) Granting the Landlord leave to Retain the Proceeds from a certain Letter of Credit and Apply the Same to the Debtors' Lease Arrears; and (III) Directing the Debtors to Replenish the Letter of Credit (the "**Motion to Compel**").  On November 18, 2013, the Debtors filed their objection to the Motion to Compel.

In order to resolve the Motion to Compel, avoid any further disputes with the Landlord, and obtain maximum value for the Lease, on December 4, 2013 the Debtors entered into a stipulation with the Landlord (the "**Landlord Stipulation**") resolving all disputes between the parties.  The Landlord Stipulation provided in material part:

- The Landlord would release any and all obligations of the Debtors to the Landlord, whether arising pre-petition or post-petition, including but not limited to claims for rent, additional rent, fees (including legal fees), interest, charges, water, electricity, cleaning, moving, access, personal property removal, or otherwise, whether arising under the Lease, the Bankruptcy Code or otherwise, from the beginning of time through December 31, 2013, including any rejection damages;

- The Landlord would retain the Draw Proceeds and withdraw the Motion to Compel with prejudice;

- The Debtors would vacate and surrender the Premises to the Landlord as soon as reasonably practicable, at the Debtors' sole and absolute discretion, no later than February 28, 2014;

- The Landlord would accept the Premises upon surrender "as is," and the Debtors would have the right, in their sole and absolute discretion and at no cost, to abandon personal property left on the Premises at the time the Debtors surrendered the Premises;

- The Landlord would pay to the Debtors $1.25 million (the "**Settlement Payment**") in connection with the Debtors' surrender of the Premises (the "**Payment Date**") in accordance with the terms and conditions of the Landlord Stipulation; and

- The Lease would be deemed rejected as of the Payment Date.

16

By order dated December 18, 2013, the Court approved the Landlord Stipulation. On December 31, 2013, the Debtors surrendered the Premises, and on February 3, 2014 the Landlord transferred the Settlement Payment to the Debtors in the amount of $1.25 million.

### D.    The Life Insurance Policies

In the ordinary course of business, IFEC LP took out eight different "key man" life insurance policies (the "**Life Insurance Policies**") on its founder and then CEO, John Taylor. The Life Insurance Policies had an aggregate death benefit in the amount of approximately $36 million. The Debtors allowed one policy to lapse prior to the Petition Date because it had no cash or future value to the Debtors, and cashed in the remaining policies for an aggregate payment to IFEC LP of approximately $1.1 million.

### E.    The Corporate Insurance Policies

Prior to the Petition Date, the Debtors purchased various insurance policies from third-party insurance carriers (collectively, the "**Insurance Carriers**") providing a wide array of coverage including, but not limited to, general liability, property, directors' and officers' liability, professional liability (*i.e.*, "errors and omissions"), and investment activities (each an "**Insurance Policy**" and collectively, the "**Insurance Policies**"). In an effort to manage and maximize their cash flow, the Debtors financed the payment of the premiums for their Primary Insurance Policies through certain insurance premium financing programs (each a "**PFA**", and collectively, the "**PFAs**"). According to the terms of the PFAs, the companies financing such PFAs may have the contractual right to cancel the Primary Insurance Policies in the event of non-payment by the Debtors of their obligations under the PFAs.

After the Petition Date, the Debtors determined that certain Insurance Policies were necessary to continue to provide insurance coverage for critical business functions, and to protect the Debtors' remaining assets and value (the "**Primary Insurance Policies**"). On November 26, 2013, one of the Debtors' two premium financing companies, Imperial Financing Specialists ("**IPFS**"), filed a motion for an order seeking adequate protection, or, alternatively, relief from the automatic stay (the "**IPFS Motion**") [Docket No. 108] in connection with IPFS's alleged perfected security interest in certain unearned premiums and dividends regarding one of the Primary Insurance Policies. On December 11, 2013, the Debtors filed a response to the IPFS Motion [Docket No. 131] stating that the Insurance Motion (as defined below), if granted, would resolve the concerns of IPFS by payment or otherwise.

On December 12, 2013 the Debtors sought entry of an order under Bankruptcy Code sections 105(a), 361, 362, and 363 authorizing, but not directing, the Debtors to (i) continue their Primary Insurance Policies in force; (ii) continue paying certain installment payments and finance charges required by PFAs related to such policies; and (iii) make any other payments or to otherwise take any action necessary to maintain insurance policies necessary to preserve the Debtors' assets (the "**Insurance Motion**") [Docket No. 135].

On December 18, 2013 the Court entered an Order (the "**IPFS Order**"), among other things, authorizing, but not obligating, the Debtors to pay all amounts due and owing to IPFS under the PFA and to pay all future installments under the PFA. In the event that the Debtors

failed to make any of the required payments, the IPFS Order authorized IPFS to cancel the underlying Primary Insurance Policy that it had financed.

On January 16, 2014 the Court entered an order granting the Insurance Motion.

### F.    De Minimis Assets

As discussed above (and with the exception of the remaining assets described in Section VI, below), the Debtors have sold substantially all of their assets. As a result of these sales, the Debtors had very few hard assets remaining in their estates. That said, as is customary for large commercial operations, the Debtors still had a variety of office equipment and other sundry items remaining in their New York City offices, including approximately forty desktop computers, twenty-five monitors, five television screens, two treadmills, weightlifting equipment, desks, seats, a sofa, tables, kitchen equipment, an empty aquarium, cabinets, and other office equipment (together, the "**De Minimis Assets**"). The Debtors expected that each of the De Minimis Assets would have negligible, if any, realizable value to the estates.

On December 19, 2013, the Debtors filed a motion for an order approving the sale, transfer, and/or abandonment of the De Minimis Assets. On January 16, 2014, the Court approved the motion and issued an order authorizing the Debtors to sell, transfer, and/or abandon the De Minimis Assets. Pursuant to such order, the Debtors have sold or otherwise disposed of the De Minimis Assets.

### G.    Analysis of Potential Claims

In consultation with the Debtors' CRO, the Debtors' counsel and conflicts counsel commenced an investigation in early 2014 concerning certain potential claims against the Debtors' former officers and directors based on allegations of mismanagement and self-dealing made, among other places, in filings in the Bankruptcy Court. To the extent that the allegations concerned John R. Taylor, Jr., the Debtors' general bankruptcy counsel, FDH, did not participate in the investigation.

The investigation consisted primarily of a series of interviews with a select group of the Debtors' former officers, employees and professionals. The purpose of these interviews, which were conducted by DTK with the assistance of FDH or Withers Bergman LLP, as appropriate, was to determine whether there was evidence of actionable self-dealing or mismanagement sufficient to warrant further investigation. Counsel reported to the Debtors' CRO concerning the results of the interviews and a review of certain of the Debtors' business records. The Debtors have determined, particularly in view of the Taylor Settlement, that the information obtained during the investigation does not warrant pursuing potential claims for self-dealing or mismanagement at this time, although the Debtors have reserved the right to pursue certain potential claims, subject to applicable releases. See Section 6.3 (Reserved Causes of Action) below for more information regarding potential claims.

### VI.    THE DEBTORS' REMAINING ASSETS

While the Debtors have liquidated as many of their assets as is feasible under the circumstances, IFEC Holdings and IFEC LP still have certain isolated non-cash assets. These

assets, while illiquid and difficult to value, are believed to have potentially material value as discussed below. Nevertheless, because of the nature of the assets, the fluidity and unpredictability of the relevant market, and the fact that the value of these assets rests largely on future events beyond the Debtors' control, it is impossible to assign a value to these assets with any reliability. Note that there can be no assurance that any value will be realized for these assets, or, if value is realized, what that value will be.

### 6.1    The John Taylor Settlement

On July 14, 2014, the Debtors and AMF signed a settlement agreement with their founder and former C.E.O. John R. Taylor Jr. (the "**Taylor Settlement**"). The Taylor Settlement resolved the Debtors' approximately $20.3 million in claims against Mr. Taylor and reduced AMF's claim against the Debtors by more than $7.3 million. The Taylor Settlement was approved by the Bankruptcy Court on July 29, 2014 [Docket No. 283]. The terms of the Taylor Settlement are set forth in more detail below.

### A.    Mr. Taylor's Financial Obligations to the Debtors and AMF

In a series of transactions from 2009 forward, Mr. Taylor received, in addition to his regular compensation, substantial sums from the Debtors that he agreed to repay. As a result of some of these transactions, Mr. Taylor signed a note (the "**Taylor Note**") on April 10, 2013 agreeing to pay IFEC $1,580,898.85 plus interest as "a consolidation, modification, amendment and restatement of the terms" of certain prior debts. The Note contains an unambiguous promise "to pay to the order of International Foreign Exchange Concepts Holdings, Inc. ... the principal sum of One million five hundred an[d] eighty thousand eight hundred ninety eight and 85/100 ($1,580,898.85)" and specifies that it bears interest at the rate of 5.5% annually. Absent a default, however, the unpaid principal, interest and other sums owed under the Taylor Note were not due and payable until April 9, 2016.

In June 2010, after the Debtors had grown dramatically and had billions of dollars under management, IFEC LP provided Mr. Taylor with an additional $20 million. As described above, IFEC LP entered into a Note Purchase Agreement that in effect borrowed an additional $20 million from AMF. IFEC LP then transferred the $20 million to Mr. Taylor, who used it in part to buy a Manhattan apartment. Mr. Taylor in turn agreed to repay the Debtors for the $20 million over time with the proceeds of sales of some of his IFEC stock in an annual auction. The sales permitted the Debtors' employees to increase their ownership interest in their employer.

Mr. Taylor's obligation to repay IFEC LP in connection with the June 2010 transaction is set forth in the Distribution and Contribution Agreement (the "**DCA**") he signed as of June 7, 2010. The DCA provides:

> [Taylor] agrees that, during the period beginning on January 1, 2011 and ending on December 31, 2020 (the "Contribution Period"), he shall (i) sell shares of Holdings capital stock in connection with the annual Holdings stock auction and (ii) contribute the proceeds from such stock sales to the capital of the Partnership in an amount equal to the [$20 million] Distribution. If the Partner ceases to be an employee of the IFEC Group, whether by voluntary resignation, termination,

death or otherwise (a "Cessation Event"), the Partner (or his estate) shall promptly following such Cessation Event contribute to the Partnership an amount equal to the difference between the Distribution and amounts contributed through the date of such Cessation Event to the Partnership pursuant to the immediately preceding sentence.

In addition, in 2012, as a result of their financial condition, the Debtors negotiated an amendment of their June 2010 transaction with AMF that would allow them more time to pay (the "**2012 Agreement**").  Among other things, the Debtors and AMF agreed that the Debtors would have the right to defer certain quarterly payments due to AMF under the Revenue Share Notes for up to eight quarters.  In connection with that 2012 Agreement, Mr. Taylor entered into a personal guarantee, dated as of December 14, 2012, in favor of AMF, under which he guaranteed the payment of any deferred payments (the "**Taylor Guarantee**").  The Taylor Guarantee provided that Mr. Taylor:

> absolutely, unconditionally and irrevocably personally guarantees as primary obligor and not merely as a surety to the Partnership the full, prompt and unconditional payment when due of an amount of the obligations and liabilities under the Revenue Share Notes and the Make-Whole Promissory Notes equal to the greater of (i) $4,000,000 and (ii) the aggregate amount of all amounts of Quarterly Payments deferred in accordance with the Revenue Share Notes that have not been subsequently repaid, including any Deferred Payment Interest…, provided that, if a Guarantee Trigger Event … occurs, then the amount of Deferred Payment Interest for purposes of this Guarantee shall be recalculated from the date of the first deferred payment based on an interest rate, compounding quarterly, of 18% per annum…

The amount Mr. Taylor owed to AMF under the Taylor Guarantee was at least $7.3 million in principal and interest.  In addition, AMF asserted that it had a good faith argument that it was entitled to a further $1 million in principal plus related interest, as well as arguments for substantial additional increases in the guaranteed sums.

In support of his personal guarantee, Mr. Taylor gave AMF a security interest in his shares (the "**Taylor Inspiration Shares**") in Inspiration Biopharmaceuticals, Inc. ("**Inspiration**"), a late stage biopharmaceutical company that Mr. Taylor helped to create.  To perfect that security interest, Mr. Taylor gave AMF physical possession of the shares.

### B.    The Parties' Negotiations

In November 2013, the Debtors began intensive negotiations with Mr. Taylor and AMF concerning repayment of the sums Mr. Taylor owed.  Initially, the Debtors and AMF focused on obtaining information from Mr. Taylor to determine whether and when he would be able to pay sums due.  The information Mr. Taylor provided showed that he had two principal assets with which to pay the Debtors and AMF.  One was his equity in his Manhattan apartment, which was sold on July 30, 2014.  The second was his interest in the Taylor Inspiration Shares, which entitled their owner or possessor to payments under a "waterfall" approved in the Inspiration bankruptcy case in the United States Bankruptcy Court for the District of Massachusetts (Eastern

Division), Case No. 12-18687-WCH.  The amount of the payments Mr. Taylor ultimately will receive on account of the Taylor Inspiration Shares depends on potential future sales of certain drugs that Inspiration developed to treat hemophilia, and the payments are therefore uncertain, as discussed below.  Mr. Taylor has estimated the value of the Taylor Inspiration Shares at $50 million, but the Debtors have not been able to verify that estimate.  In fact, although the Debtors and AMF both believe that the Taylor Inspiration Shares have value and have made extensive efforts to quantify that value, they have been unable to do so.

Based on Mr. Taylor's financial information, it became clear that he would be able to repay the Debtors and AMF in full if his Inspiration Shares are worth a substantial proportion of his $50 million estimate, but given Mr. Taylor's lack of liquidity, the Debtors and AMF were not likely to be paid in full for some time.  From the beginning, the negotiations with Mr. Taylor, which also necessarily involved AMF, were complex and often highly contentious.  The parties were millions of dollars apart in calculating the sums due, AMF disputed the adequacy of the financial information Mr. Taylor had provided, and the value and marketability of the Taylor Inspiration Shares was far from certain.  In addition, Mr. Taylor raised several issues and asserted significant potential defenses with respect to collection of the sums due.  These defenses are discussed in the Debtors' motion to approve the Taylor Settlement which was filed with the Court on July 14, 2014 and granted on July 29, 2014.

### C.    The Terms of the Taylor Settlement

After more than seven months of meetings, telephone conferences and exchanges of draft settlement documents, the parties settled their respective claims by entering into the Taylor Settlement.  The main provisions of the Term Sheet setting out the Settlement are:

1.    Mr. Taylor will pay AMF and the Debtors $18.5 million (the "**Payment Amount**") in principal, subject to the Debtors' right to seek additional sums upon a payment default.

2.    The unpaid portion of the Payment Amount will accrue interest at 5% per year, which will result in an additional payment of approximately $2 million if Mr. Taylor does not pay down sums due before June 2018.

3.    Mr. Taylor agreed to close on the sale of his apartment in July 2014, and AMF and the Debtors reserved certain rights with respect to sale of the apartment if he did not.  The apartment sold for a price that yielded more than $10.5 million in net proceeds, 80% of which was paid to the Debtors and AMF.  Of this sum, $7,314,632 was distributed to AMF on behalf of the Taylor Guarantee, with a dollar-for-dollar reduction of AMF's claim against the Debtors.  The remainder of approximately $1.2 million was distributed to the Debtors.

4.    Amounts paid to the Debtors or AMF from the proceeds of the apartment sale have reduced the Payment Amount on a dollar-for-dollar basis, and any amounts paid to AMF have reduced the Debtors' obligations to AMF on a dollar-for-dollar basis.

**5.**    The Payment Amount will be paid in full no later than June 30, 2018, and if it is not, the Debtors will have the right to require a sale of the Taylor Inspiration Shares to make up any shortfall.

**6.**    If a payment default occurs, the Debtors will be entitled to exercise their rights under the Term Sheet or any prior agreement with Mr. Taylor.

**7.**    The payment to AMF from the sale of the apartment satisfied Mr. Taylor's obligations to AMF in full, releasing AMF's security interest in the Taylor Inspiration Shares.

**8.**    Mr. Taylor has pledged 70% of his Inspiration Shares and all related rights to secure his obligations to the Debtors.  Absent the settlement, the Debtors had no security interest to support Taylor's obligations.

**9.**    Mr. Taylor purchased the FX Concepts Newsletter, for which there were no other buyers, with no sums due to any party.  Mr. Taylor assumed responsibility for any liabilities of the Newsletter in respect of its publication during the period after December 19, 2013.

**10.**    If Mr. Taylor receives net income greater than $1 million in any year in which the Payment Amount remains unpaid, he will be required in certain circumstances to turn over a portion of that income to the Debtors as a prepayment of the Payment Amount.

**11.**    Five-sevenths of any post-tax distributions received on account of the pledged Taylor Inspiration Shares – which amounts to half of the distributions on Mr. Taylor's Inspiration Shares as a whole – will be paid to the Debtors to reduce the Payment Amount.  Also, all of the post-tax proceeds of any sale of the pledged Inspiration Shares will be used to pay down the outstanding Payment Amount.  If the Inspiration Shares that are not pledged are sold, the Debtors will have certain "tag along" rights.

**12.**    AMF and the Debtors granted releases to Mr. Taylor, subject to certain conditions, and he in turn granted releases to them.

**13.**    The Term Sheet became effective upon Court approval on July 29, 2014.

**14.**    The parties have agreed to negotiate definitive documentation of their agreement in good faith, but if such documentation is not executed, then the provisions of the Term Sheet will nevertheless be binding.

### D.    Status as of Filing of Disclosure Statement

Mr. Taylor's apartment sale closed as scheduled on July 31, 2014 and, as provided in the Newsletter Agreement, he has taken over ownership of the FX Concepts Newsletter.  In accordance with the Taylor Settlement, the Debtors received $1,222,382 from the proceeds of the

apartment sale and AMF received $7,314,632. Because the payment to AMF was on account of Mr. Taylor's partial guarantee of the Debtors' obligations to AMF, and by agreement of the parties, the payment to AMF reduced the amount the Debtors owe to AMF, as well as the amount Mr. Taylor owes to the Debtors, on a dollar-for-dollar basis.

In addition, as a result of the foregoing payments, Mr. Taylor has satisfied his obligations to AMF under the Taylor Guarantee in full, but he still owes the Debtors slightly less than $10 million in principal plus 5% per year in interest. This debt is payable in no more than four years and is secured by a security interest in Mr. Taylor's rights related to his Inspiration Shares. Also, the debt will be reduced over time by (a) five-sevenths of any post-tax cash flow from the Inspiration Waterfall (as defined below) and (b) a substantial portion of any annual income in excess of $1 million that Mr. Taylor may receive until the debt is paid, subject to certain conditions. The Debtors are able to seek payment of an increased amount from Mr. Taylor in the event of a payment default.

The Debtors' recoveries as a result of the Taylor Settlement remain subject, however, to significant risk. Among other risks, his ability to pay the amount due appears largely reliant on the value of his rights in the Inspiration Waterfall, which value is contingent and uncertain (as more fully discussed below). If the distributions under the Inspiration Waterfall, or the rights related thereto, are not sufficiently valuable by June 2018 to pay Mr. Taylor's remaining obligations, he may not have alternative resources to pay the sums due.

### 6.2    The Inspiration Waterfall

As discussed above, Inspiration is a late stage biopharmaceuticals company that Mr. Taylor founded and in which Mr. Taylor held a substantial equity stake. As a result of various transactions over time, IFEC LP also held a substantial equity stake in Inspiration (1,272,000 shares of Inspiration stock). Inspiration, however, recently went through its own bankruptcy proceeding in the District of Massachusetts pursuant to which it sold its assets to two different buyers (the "**Inspiration Sale**") and during which it established the procedures for distribution of any proceeds from that Sale (the "**Inspiration Waterfall**"). Mr. Taylor is entitled to 21.6% of all distributions to "eligible shareholders" under the Inspiration Waterfall ("eligible shareholders" are included in Priority 6 and 7 of the Waterfall) and IFEC LP is entitled to 5.2% of such distributions. However, the time and amount of distributions under the Inspiration Waterfall, if there are any such distributions, depend entirely on the future success of certain drugs that remain in development, none of which have received formal approval in the United States or European Union. Accordingly, despite the Debtors' inquiries concerning the matter, the Debtors have not been able to project with any reliability the value of these rights in the Inspiration Waterfall. Moreover, because of the terms of the Inspiration Sale and the Inspiration Waterfall, the Debtors have also been unable to project with any reliability when, if at all, such value would be received. Further information relating to Inspiration, the Inspiration Sale, and the Inspiration Waterfall is available in the Plan of Liquidation that was confirmed in the Inspiration bankruptcy case [Case number 12-18687-WCH, District of Massachusetts, Docket no. 631] and the associated disclosure statement [Docket no. 632].

**6.3     Reserved Causes of Action**

The Debtors reserve the right to pursue all claims and causes of action that they can properly pursue in accord with law.  See Section 8.4 below for further information on the reserved causes of action.  These include:

**A.**     All claims against Mr. Taylor or his wife arising out of or preserved by the Taylor Settlement, the Term Sheet or any definitive documentation entered into in connection with the Term Sheet, including any claims for breach of or default under those agreements.

**B.**     All claims against Mr. Taylor or his wife arising out of or preserved by any agreement related to the sale of the FX Concepts Newsletter to Taylor, including claims for breach of or default under those agreements.

**C.**     Subject to the releases granted in the Taylor Settlement and Term Sheet, all claims for payment of sums due from Mr. Taylor or his family based upon agreements between Mr. Taylor or his family members and any of the Debtors.  The principal agreements that support these claims are the Taylor Note and the Distribution and Contribution Agreement mentioned above. However, the courts may determine that other agreements -- whether in writing or made orally with officers or directors of the Debtors -- will also support claims for payment or remedies against Mr. Taylor or his wife.  Accordingly, it is possible that the Debtors may assert rights or seek remedies in reliance on, inter alia, the Letter Agreement dated July 18, 2013, the powers of attorney signed in accord with that Letter Agreement, or agreements that Mr. Taylor entered into with the Debtors before he executed the Taylor Note, such as the prior agreements identified in that Note.

**D.**     Subject to the releases granted in the Taylor Settlement and Term Sheet, all claims against Mr. Taylor for mismanagement of the Debtors or their assets, including claims for breach of contract or breach of fiduciary duty, arising from a lack of due care or breach of the duty of loyalty in managing the Debtors.  Certain former employees of the Debtors have alleged that Mr. Taylor failed to devote sufficient care and attention to the management of the Debtors due to his work for unaffiliated businesses, thereby contributing to the Debtors' financial failure. As discussed above, although allegations have been made in support of these claims, the information that the Debtors have reviewed to date does not provide a sufficient basis for them. However, the Debtors reserve the right to investigate further and to pursue appropriate mismanagement claims to the extent that a genuine factual basis for them is discovered.

**E.**     Subject to the releases granted in the Taylor Settlement and Term Sheet, all claims for breach of contract, breach of fiduciary duty, conversion, preferential or fraudulent transfers, fraudulent conveyances, or other improper transfers of property in which the Debtors had an interest to Mr. Taylor, family members of Mr. Taylor, companies or trusts controlled by Mr. Taylor, companies in which Mr. Taylor had an interest, or persons or entities designated by Mr. Taylor.  As discussed above, although allegations have been made in support of these claims, the information that the Debtors have reviewed to date does not provide a sufficient basis for them.  However, the Debtors reserve the right to investigate and to pursue appropriate claims for improper transfers to the extent that a genuine factual basis for them is discovered.

24

F.      Subject to the releases granted in the Taylor Settlement and Term Sheet, all defenses to any assertion by Mr. Taylor of a right of indemnification, to the extent that the defense may also be considered a "claim."

## VII.    DESCRIPTION OF THE PLAN

The Plan is a liquidating plan, and provides for the separate treatment of each of the Debtors' Estates.  IFEC Holdings' Assets, after allocation of appropriate bankruptcy and trust expenses, will be transferred into the Liquidating Trust to satisfy the claims of IFEC Holdings' creditors.  IFEC LP's Assets, after allocation of appropriate bankruptcy and trust expenses, will be transferred into the Liquidating Trust to satisfy the claims of IFEC LP's creditors.  FXC's Assets, after allocation of appropriate bankruptcy and trust expenses, will be transferred into the Liquidating Trust to satisfy the claims of FXC's creditors and its member.

The Claims against and Interests in the Debtors will be satisfied as set forth below.  Where possible, the Debtors have identified the aggregate amount of claims that have been scheduled or filed in the relevant class (or unclassified category, as appropriate).  All rights are explicitly reserved and preserved with respect to all claims, whether identified below or not, including the right to object to or otherwise contest liability on all or part of such claims.

### 7.1    Unclassified Claims

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for the purposes of voting on, or receiving distributions under, the Plan.  All such Claims are instead treated separately in accordance with the terms set forth in Article II of the Plan and as described within this Section VII.

### A.      Administrative Expense and Statutory Claims.

**1.**      _General_.  On, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (iii) the date on which an Allowed Administrative Expense Claim becomes payable under any agreement or applicable law relating thereto, each holder of such Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Administrative Expense Claim, Cash equal to the unpaid portion of such Allowed Administrative Expense Claim.  Notwithstanding the foregoing, (y) any Allowed Administrative Expense Claim based on a liability incurred by any Debtor in the ordinary course of business during the Bankruptcy Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Expense Claim may be paid when payable under applicable law or on such other terms as may be agreed to between the holder of such Claim and the Liquidating Trustee.

**2.**      _U.S. Trustee's Fees_.  The outstanding fees due to the United States Trustee pursuant to 11 U.S.C. § 1930 shall be paid in full on or before the Effective Date.

3.      Professional Compensation and Expense Reimbursement Claims.

(a)      Within thirty (30) days after the Effective Date, each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.

(b)      Any Allowed Professional Fee Claim shall receive: (i) payment upon entry of a Non-Appealable Order approving such Claim, or (ii) payment as agreed between the holder of the Allowed Administrative Expense Claim and the Liquidating Trustee.

(c)      All fees and expenses of Professionals for services rendered after the Effective Date shall be paid by the Liquidating Trustee upon the receipt of reasonably detailed invoices in such amounts and on such terms as such Professional and the Liquidating Trustee agree.  No further order or authorization from the Bankruptcy Court shall be necessary to permit the payment of the fees and expenses of Professionals for services rendered after the Effective Date.

4.      Amount of Administrative Claims.  The Debtors anticipate that the aggregate total of unpaid Administrative Claims as of the Effective Date will be approximately $400,000.

**B.      Priority Tax Claims.**

1.      On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for, such Allowed Priority Tax Claim, (i) payment in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, or (ii) payment as agreed between the holder of the Allowed Priority Tax Claim and the Liquidating Trustee.

2.      In the Schedule of Assets and Liabilities and Schedule of Executory Contracts and Unexpired leases (its "**Schedules**") filed by IFEC Holdings in its case [Docket no. 101], by IFEC LP in its case [Docket No. 24], and by FXC in its case [Docket No. 8], the Debtors did not identify any Priority Tax Claims against any of the Debtors.  In addition to the claim filed against IFEC Holdings by the Internal Revenue Service (which such claim has been or will soon be withdrawn), four proofs of claim were filed against IFEC Holdings asserting an aggregate of approximately $13,000 in Priority Tax Claims, three proofs of claim were filed against IFEC LP asserting an aggregate of approximately $900,000 in Priority Tax Claims, and one proof of claim was filed against FXC asserting a Priority Tax Claim of $435,692.25

7.2    **Classified Claims**

    A.    **Class 1 – Priority Claims**

        1.    <u>Classification</u>.  Class 1 consists of the Allowed Priority Claims.

        2.    <u>Impairment and Voting</u>.  The Priority Claims are unimpaired under the Plan and shall be deemed to have accepted the Plan.

        3.    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, and release of the Allowed Priority Claims, the holders of Allowed Class 1 Claims shall be paid in full upon the later of the Effective Date or entry of an order of the Bankruptcy Court allowing such Claim.

        4.    <u>Amount of Priority Claims</u>.  In their Schedules, none of the Debtors identified any Priority Claims against it.  No proofs of claim were properly filed against IFEC Holdings asserting a Priority Claim, two proofs of claim were filed against IFEC LP properly asserting an aggregate of slightly less than $25,000 in Priority Claims, and no proofs of claim were filed against FXC properly asserting a Priority Claim.

    B.    **Class 2 – Secured Claims**

        1.    <u>Classification</u>.  Class 2 consists of the Allowed Secured Claims.

        2.    <u>Impairment and Voting</u>.  The Secured Claims are unimpaired under the Plan and shall be deemed to have accepted the Plan.

        3.    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, and release of the Allowed Secured Claims, each holder of an Allowed Class 2 Claim shall receive, at the Debtors' election, either (i) cash equal to the allowed amount of such Secured Claim upon, or as soon as reasonably practicable after, the later of the Effective Date or entry of an order of the Bankruptcy Court allowing such Claim, or (ii) a return of the underlying collateral securing such Claim.

        4.    <u>Amount of Secured Claims</u>.  In its Schedules, IFEC Holdings identified one secured claim in the amount of approximately $377,000, which claim has been fully satisfied during the Bankruptcy Cases.  IFEC LP identified one secured claim in the amount of $690,000, which claim has been fully satisfied during the Bankruptcy Cases.  FXC did not identify any Secured Claims in its Schedules, and no additional proofs of claim were filed against any of the Debtors asserting secured claims.  As a result, the Debtors anticipate that there will be no unpaid Secured Claims as of the Effective Date.

    C.    **Class 3A – IFEC Holdings General Unsecured Claims.**

        1.    <u>Classification</u>. Class 3A consists of the Allowed IFEC Holdings General Unsecured Claims.

**2.**    Impairment and Voting.  The IFEC Holdings General Unsecured Claims are impaired under the Plan.  Each holder of an IFEC Holdings General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

**3.**    Claim Treatment.  In full and complete satisfaction, settlement, and release of their respective Allowed IFEC Holdings General Unsecured Claims, each holder of an Allowed IFEC Holdings General Unsecured Claim (other than an Intercompany Claim) shall receive a cash payment equal to 10% (ten percent) of its Allowed IFEC Holdings General Unsecured Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) five business days after such Claim becomes an Allowed IFEC Holdings General Unsecured Claim.  On or as soon as reasonably practicable after the Effective Date, Intercompany Claims against IFEC Holdings shall be adjusted, cancelled, continued, waived, or discharged in full or in part, in each case as determined by the Liquidating Trustee.  Intercompany Claims against IFEC Holdings will not be entitled to a distribution under this Plan.

**4.**    Estimated Amount of Claims.  In its Schedules [Docket No. 101], IFEC Holdings listed $34,106,266 in general unsecured claims, not including Intercompany Claims.  Of that amount $34 million was claimed by AMF.  In addition, 29 proofs of claim were filed against IFEC Holdings asserting general unsecured claims.  Adjusting for claims that have been consensually resolved, are duplicative with scheduled claims, or for which IFEC Holdings has defenses which it believes will not be contested, the Debtors believe total general unsecured claims (excluding AMF) against IFEC Holdings will aggregate approximately $1.6 million.

**5.**    Amount and Timing of Distributions.  Absent the agreement by AMF that is incorporated into the Plan, and reserving for Disputed Claims as set forth in the Plan, the Debtors anticipate that they would have been able to make an initial distribution on the Effective Date to holders of Allowed IFEC Holdings General Unsecured Claims in an amount equal to approximately 0.4% of such claims.  However, because the terms of the Plan contemplate a set distribution on account of Allowed IFEC Holdings General Unsecured Claims, the Debtors will make cash payments equal to 10% of each Allowed IFEC Holdings General Unsecured Claim on the earlier of, or as soon as reasonably practicable after, the Effective Date and five business days after each such Claim becomes an allowed Claim.

**D.**    **Class 3B – IFEC LP General Unsecured Claims.**

**1.**    Classification. Class 3B consists of the Allowed IFEC LP General Unsecured Claims.

**2.**    Impairment and Voting.  The IFEC LP General Unsecured Claims are impaired under the Plan.  Each holder of an IFEC LP General Unsecured Claim shall be entitled to vote to accept or reject the Plan.

**3.**    Claim Treatment.  In full and complete satisfaction, settlement, and release of their respective Allowed IFEC LP General Unsecured Claims, each holder of

an Allowed IFEC LP General Unsecured Claim (other than an Intercompany Claim) shall receive a cash payment equal to 50% (fifty percent) of its Allowed IFEC LP General Unsecured Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) five business days after such Claim becomes an Allowed IFEC LP General Unsecured Claim.  On or as soon as reasonably practicable after the Effective Date, Intercompany Claims against IFEC LP shall be adjusted, cancelled, continued, waived, or discharged in full or in part, in each case as determined by the Liquidating Trustee.  Intercompany Claims against IFEC LP will not be entitled to a distribution under this Plan.

   **4.** Estimated amount of Claims.  In its Schedules [Docket No. 24], IFEC LP listed $50,664,154 in general unsecured claims.  Over $15 million of those general unsecured claims have either been satisfied in full, are entirely subject to setoff, or are intercompany claims that will not be satisfied under the Plan.  In addition, 26 proofs of claim were filed against IFEC LP asserting general unsecured claims.  Adjusting for claims that have been consensually resolved, that are duplicative with scheduled claims, or for which IFEC LP has defenses which it believes will not be contested, the Debtors believe total general unsecured claim against IFEC LP (excluding AMF) will aggregate approximately $1.9 million.

   **5.** Amount and Timing of Distributions.  Absent the agreement by AMF that is incorporated into the Plan, and reserving for Disputed Claims as set forth in the Plan, the Debtors anticipate that they would have been able to make an initial distribution on the Effective Date to holders of Allowed IFEC LP General Unsecured Claims in an amount equal to approximately 10% of such claims.  However, because the terms of the Plan contemplate a set distribution on account of Allowed IFEC LP General Unsecured Claims, the Debtors will make cash payments equal to 50% of each Allowed IFEC LP General Unsecured Claim on, or as soon as reasonably practicable after, the earlier of the Effective Date and five business days after each such Claim becomes an allowed Claim.

  **E.** **Class 3C – FXC General Unsecured Claims.**

   **1.** Classification.  Class 3C consists of the Allowed FXC General Unsecured Claims.

   **2.** Impairment and Voting.  The FXC General Unsecured Claims are unimpaired under the Plan.  Each holder of a FXC General Unsecured Claim shall be conclusively deemed to have accepted the Plan.

   **3.** Claim Treatment.  In full and complete satisfaction, settlement, and release of their respective Allowed FXC General Unsecured Claims, each holder of an Allowed FXC General Unsecured Claim shall receive, on, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) five business days after the date on which such Claim becomes an Allowed FXC General Unsecured Claim, (1) cash in an amount equal to its Allowed FXC General Unsecured Claim, and (2) interest on account of such FXC General Unsecured Claim at the Plan Interest Rate, calculated from

the Petition Date through the date upon which such Allowed FXC General Unsecured Claim is paid.

4.    Estimated Amount of Claims.  In its Schedules [Docket No. 8], FXC listed $198,683.06 in general unsecured claims.  In addition, 16 proofs of claim were filed asserting general unsecured claims against FXC.  Adjusting for claims that have been consensually resolved, that are duplicative with scheduled claims, or for which FXC has defenses which it believes will not be contested, the Debtors believe general unsecured claims against FXC will aggregate slightly less than $700,000.

5.    Amount and Timing of Distributions.  FXC anticipates that it will have approximately $1.6 million in cash on the Effective Date, net of reserves for unpaid Administrative Claims, Priority Tax Claims, Priority Claims, and the Trust Reserve. Reserving for Disputed Claims as set forth in the Plan, the Debtors anticipate that they will be able to make a distribution on, or as soon as reasonably practicable after, the Effective Date to holders of Allowed FXC General Unsecured Claims in an amount equal to 100% of such allowed claims, plus interest from the Petition Date at the Plan Interest Rate.

**F.    Class 3D – AMF Claims.**

1.    Classification. Class 3D consists of the Allowed AMF Claims.

2.    Impairment and Voting.  The AMF Claims are impaired under the Plan.  AMF, as the holder of the AMF Claim, shall be entitled to vote to accept or reject the Plan.

3.    Claim Treatment.  The AMF Claim shall be consolidated and allowed as a single general unsecured claim against each of IFEC Holdings and IFEC LP in the amount of $26,685,368.  In full and complete satisfaction, settlement, and release of its Allowed AMF Claim, the Net Proceeds of the IFEC Holdings Assets and the IFEC LP Assets, after payment or reserve for payment of any Allowed Administrative Expense Claims allocable to IFEC Holdings and IFEC LP, Priority Claims allocable to IFEC Holdings and IFEC LP, Priority Tax Claims allocable to IFEC Holdings and IFEC LP, IFEC Holdings General Unsecured Claims, and IFEC LP General Unsecured Claims to the extent set forth in Sections 4.3 and 4.4, respectively, of the Plan, shall be distributed to AMF.

4.    Amount and Timing of Distributions.  The Debtors anticipate that they will be able to distribute approximately $2.6 million to AMF on the Effective Date, or approximately 10% of the AMF claim.  The Debtors anticipate also distributing to AMF on the Effective Date all of the Debtors' remaining non-cash Assets, including the Debtors' rights related to the Taylor Settlement, and IFEC LP's rights under the Inspiration Waterfall.

G.    **Class 4A – IFEC Holdings Equity Interests**

        **1.**    <u>Classification</u>.  Class 4A consists of all IFEC Holdings Equity Interests.

        **2.**    <u>Impairment and Voting</u>.  Class 4A is impaired under the Plan. Each holder of an IFEC Holdings Equity Interest shall be conclusively deemed to have rejected the Plan.

        **3.**    <u>Treatment</u>.  IFEC Holdings Equity Interests shall be deemed canceled and terminated as of the Effective Date, and the holders of IFEC Holdings Equity Interests shall not receive or retain any property or interest in property on account of such Equity Interest.

H.    **Class 4B – IFEC LP Equity Interests**

        **1.**    <u>Classification</u>.  Class 4B consists of all IFEC LP Equity Interests.

        **2.**    <u>Impairment and Voting</u>.  Class 4B is impaired under the Plan. Each holder of an IFEC LP Equity Interest shall be conclusively deemed to have rejected the Plan.

        **3.**    <u>Treatment</u>.  IFEC LP Equity Interests shall be deemed canceled and terminated as of the Effective Date, and the holders of IFEC LP Equity Interests shall not receive or retain any property or interest in property on account of such Equity Interest.

I.    **Class 4C – FXC Equity Interests**

        **1.**    <u>Classification</u>.  Class 4C consists of all FXC Equity Interests.

        **2.**    <u>Impairment and Voting</u>.  Class 4C is impaired under the Plan.  The holder of the FXC Equity Interest shall be entitled to vote to accept or reject the Plan. Because IFEC LP is the only holder of an FXC Equity Interest, and is a proponent hereof, IFEC LP shall be deemed to have voted to accept the Plan, and Class 4C shall be deemed to have voted to accept the Plan as a Class.

        **3.**    <u>Claim Treatment</u>.  In full and complete satisfaction, settlement, and release of the FXC Equity Interests, the Net Proceeds of the FXC Assets, after payment or reserve for payment of any Allowed Administrative Expense Claims allocable to FXC, Priority Claims allocable to FXC, Priority Tax Claims allocable to FXC, and Allowed FXC General Unsecured Claims, will be distributed to IFEC LP as the sole equity holder of FXC, and shall be deemed "Proceeds" of the IFEC LP Assets hereunder.

        **4.**    <u>Amount and Timing of Distributions</u>.  The Debtors anticipate that approximately $900,000 will be available for distribution to IFEC LP on account of its equity interest in FXC as of the Effective Date.

## VIII.   MEANS FOR IMPLEMENTATION OF THE PLAN

### 8.1    Plan Implementation.

On the Effective Date, the Liquidating Trust shall be established and all of the Assets that have not been distributed by the Estates in accordance with the terms of the Plan shall vest in the Liquidating Trust, free and clear of all Claims, Liens, and encumbrances, but subject to the payment of the Claims as provided under the Plan.

### 8.2    Corporate Action.

Confirmation of the Plan shall constitute authorization for the Debtors and the Liquidating Trustee to effectuate the Plan and to execute, issue, deliver, file or record all contracts, instruments and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan without further notice to or action, order or approval of the Bankruptcy Court or any other entity except for those expressly required pursuant to the Plan.  All matters provided for in the Plan involving any corporate action to be taken by or required of the Debtors in connection with the Plan shall be deemed to have occurred, and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects, without any requirement of further action by the Debtors, their agents, representatives, stockholders, members, managers, officers, directors or Affiliates.

### 8.3    Vesting of Property.

All property of the Estates that has not been distributed by the Estates in accordance with the terms of the Plan shall vest in the Liquidating Trust on the Effective Date free and clear of all Claims, Liens, and encumbrances, but subject to payment of the Claims as provided under the Plan.  Except as may be expressly provided in the Plan or in a Non-Appealable Order of the Bankruptcy Court, no Asset of any Estate shall be deemed abandoned and no defense, set-off, counterclaim or right of recoupment of any Debtor shall be deemed waived, released or compromised.  Any tax refunds payable to any Debtors or the Liquidating Trustee on or after the Effective Date shall constitute Assets that shall vest and become property of the Liquidating Trust.

### 8.4    Preservation of Causes of Action.

Except as provided in, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, any Non-Appealable Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Liquidating Trust will exclusively retain and may enforce, and the Liquidating Trustee expressly reserves and preserves for these purposes, in accordance with Sections 1123(a)(5)(A) and 1123(b)(3) of the Bankruptcy Code, any Claims, Causes of Action and demands and rights relating thereto that any Debtor or its Estate may hold against any Person or entity.  No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to them by virtue of or in connection with the Confirmation, consummation

32

or effectiveness of the Plan. Without limiting the forgoing, the Debtors expressly reserve and preserve those causes of action identified in Section 6.3 hereof.

**8.5    Default.**

No event of default under the Plan shall occur unless, in the event of a breach of the Liquidating Trustee's obligations under the Plan, the holder of the Allowed Claim or Equity Interest asserting the default shall provide written notice of such breach to the Liquidating Trustee and such breach is not cured: (i) in the event of a breach that can be cured by the payment of a sum of money, within ten (10) days of the Liquidating Trustee's receipt of such notice; and (ii) for any other breach, within thirty (30) days of the Liquidating Trustee's receipt of such notice, provided that, if such non-monetary breach cannot reasonably be cured within such 30-day period and the Liquidating Trustee has commenced curing such breach and continues to cure such breach, the thirty (30) day period shall be extended for such time as is reasonably necessary to cure such breach.

**8.6    Dissolution of the Debtors.**

On the Effective Date and upon the vesting of the Assets in the Liquidating Trust, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan and each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further action to be taken by or on behalf of any Debtor. The Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal and (ii) shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after such dissolution. The dissolution of the Debtors shall not and shall not be deemed to impair, prejudice, or diminish the Liquidating Trust's rights under the Plan.

**8.7    Resignation of Officers and Directors.**

Upon the Effective Date, any of the Debtors' remaining officers and members of their respective boards of directors and managers shall be deemed to have resigned, if they have not already done so, without the necessity of any further action or writing and they shall be released from any responsibilities, duties and obligations that arise after the Effective Date to the Debtors or their creditors under the Plan or applicable law.

**8.8    Further Authorization.**

The Liquidating Trustee, on behalf of the Liquidating Trust and the Debtors, shall be entitled to seek such orders, judgments, injunctions, and rulings as he deems necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

**8.9    Final Decree.**

It shall be the exclusive duty of the Liquidating Trustee to prepare and file a motion requesting that the Court enter a Final Decree closing the Bankruptcy Cases.

## IX.    DISTRIBUTIONS ON CLAIMS AND EQUITY INTERESTS
## AND RESOLUTION OF DISPUTED CLAIMS

**9.1    Method of Distributions Under the Plan.**

### A.    In General.

Subject to Bankruptcy Rule 9010, and except as otherwise provided in the Plan, all distributions under the Plan to be made by, or on behalf of, the Liquidating Trustee to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules unless the Liquidating Trustee has been notified in writing of a change of address as of the Distribution Record Date, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Liquidating Trustee shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

### B.    Form of Distributions.

Except as otherwise provided in the Plan, any payment of Cash made by, or on behalf of, the Liquidating Trustee pursuant to the Plan shall be made by check.

### C.    Distributions to be on Business Days.

Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

### D.    Fractional Dollars.

Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (rounding down in the case of $0.50 or less, and rounding up in the case of more than $0.50).

### E.    Interest and Penalties on Claims.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest and penalties shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of the Plan.

### F.    Distributions to Holders as of the Distribution Record Date.

The Liquidating Trustee shall be entitled to rely upon the register of Claims as of the Distribution Record Date.  Any transfers of an Allowed Claim shall be recognized ten (10) days after written notice of such transfer is received by the Liquidating Trustee as provided herein.

**9.2    Objections to Disputed Claims.**

Prior to the Effective Date, any objections to Claims against any Debtor shall be prosecuted by the Debtors.  On and after the Effective Date, any objections to Claims against any Debtor shall be prosecuted by the Liquidating Trustee.

**9.3    Deadline for Objecting to Disputed Claims.**

Except as otherwise provided by order of the Bankruptcy Court, the Liquidating Trustee may file an objection to a Claim against any Debtor until the later of: (a) thirty days after the date that such Claim becomes due and payable in accordance with its terms, or (b) 120 days after the Effective Date.

**9.4    Estimation of Claims.**

After the Effective Date, the Liquidating Trustee may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall have jurisdiction to estimate a Disputed Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the Bankruptcy Court determines the maximum limitation of a Disputed Claim, such determination shall not preclude the Liquidating Trustee from pursuing any supplemental proceedings to object to any payment of such Claim.  All of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not exclusive remedies.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**9.5    Disputed Claims Reserve.**

**A.    Establishment.**

A reserve (the "**Disputed Claims Reserve**") shall be maintained equal to 100% of the distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims or such lesser amount as may be required by a Non-Appealable Order.  The Disputed Claims Reserve shall be established by the Liquidating Trustee on the Effective Date and shall be maintained in accordance with the terms of the Plan and the Liquidating Trust Agreement.

**B.    Investment of Cash.**

Cash in the Disputed Claims Reserve may be invested only in Cash Equivalents having maturities sufficient to enable the holder of the Disputed Claim Reserve to make all necessary payments to holders of Disputed Claims if, and when, such Disputed Claims become Allowed Claims.  Any interest, income, distributions or accretions on account of such investment in Cash Equivalents in the Disputed Claims Reserve shall be for the sole benefit and account of the

Liquidating Trust, and the Liquidating Trust shall be solely responsible for the payment of any income or other taxes arising therefrom.

### C.    Distributions Upon Allowance of Disputed Claims.

The holder of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall receive distributions of Cash from the Disputed Claims Reserve on or after the Payment Date as soon as practicable following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Non-Appealable Order.  Such distributions shall be made in accordance with the Plan based upon the distributions that would have been made to the holder of such a Claim under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date.  No holder of a Disputed Claim shall have any claim against the respective Disputed Claims Reserve or the Liquidating Trust with respect to such Claim until the Disputed Claim shall become an Allowed Claim.

### 9.6    Reversion of Unclaimed Checks.

If a check remains unclaimed for a period of one hundred eighty (180) days after distribution, the party otherwise entitled to such distribution shall be deemed to have forfeited its right to the distribution and any future distributions, and the Liquidating Trustee may redistribute the Cash to other beneficiaries under the Plan as if such Claim or Equity Interest was disallowed.

## X.    LIQUIDATING TRUSTEE

### 10.1    Appointment of Liquidating Trustee, and Vesting of Estate Powers.

As of the Effective Date, Michael Meenan of CDG Group LLC shall be the Liquidating Trustee and the Liquidating Trust Agreement shall be deemed approved in all respects.  As of the Effective Date, the Debtors shall be authorized to enter into the Liquidating Trust Agreement, and to take all other and further steps as necessary to effectuate the transactions contemplated in the Plan, including but not limited to the establishment of the Trust Reserve.  Upon the Effective Date, the Liquidating Trustee shall be vested with the standing of and with all rights, powers and benefits afforded to a "trustee" under the Bankruptcy Code with respect to all Assets and rights belonging to the Estates, including, without limitation the standing and authority to commence, prosecute and compromise objections to Claims and Causes of Action, whether initially filed by the Debtors or as may be filed by the Liquidating Trustee, but exclusive of the rights of a trustee to make a claim under Section 326 of the Bankruptcy Code for compensation (the Liquidating Trustee's compensation being subject to the provisions of the Plan).  The Liquidating Trustee shall stand in the same position as the Debtors and/or the Estates with respect to any claim the Debtors and/or the Estates may have had to an attorney-client privilege, the work product doctrine, or any other privilege against production, and the Liquidating Trustee shall succeed to all of the Debtors' and/or the Estates' rights to preserve, assert or waive any such privilege.

### 10.2    Liquidating Trustee's Rights and Powers.

The Liquidating Trustee's rights and powers shall include the following:

- Sell at public or private sale, or exchange, transfer, or convey, on such terms and conditions, and at such time or times as the Liquidating Trustee shall determine, any or all of the Assets (whether tangible or intangible); to that end, grant options, make contracts, retain brokers, and sign, seal, acknowledge, and deliver any and all proper deeds, or other instruments of conveyance or transfer thereof; and delegate to an attorney in fact the power to execute all documents necessary to accomplish a sale, lease, transfer, or exchange of any such property;

- Obtain and maintain such space, facilities, equipment, supplies and personnel as shall be reasonably necessary for the performance of the Liquidating Trustee's duties under the Liquidating Trust Agreement and under the Plan;

- Subject to any limitations contained in the Plan and the Liquidating Trust Agreement, pay, compromise, settle, adjust, agree to, investigate, pursue, or contest any and all claims, including claims described in the Plan, other matters, or taxes;

- Pay all taxes, expenses and obligations of the Liquidating Trust out of the Assets;

- Investigate, prosecute and, if necessary, litigate, any and all Avoidance Actions and Causes of Action that may belong to any Debtor or its Estate, including any Avoidance Action brought by the Debtors prior to the Effective Date, which Causes of Action, rights to payment and claims as of the Effective Date shall vest solely and exclusively in the Liquidating Trustee, for the benefit of the Liquidating Trust, pursuant to the terms of the Plan;

- (i) Invest funds; (ii) make distributions; (iii) pay taxes and other obligations owed by the Liquidating Trust or incurred by the Liquidating Trustee or the Debtors; (iv) engage and compensate from the Assets, consultants, agents, employees, and Professionals (including, without limitation, attorneys on a contingency fee basis) to assist the Liquidating Trustee with respect to the Liquidating Trust's responsibilities (including without limitation advisors to value the Assets); (v) retain and compensate from the Assets the services of experienced auctioneers, brokers, and/or marketing agents to assist and/or advise in the sale or other disposition of the Assets; (vi) liquidate and dispose of the Assets; (vii) compromise and settle Claims and Causes of Actions; (viii) act on behalf of the Debtors and their Estates in all adversary proceedings and contested matters (including, without limitation, the Avoidance Actions) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; (ix) commence and/or pursue any and all actions involving Assets that could arise or be asserted at any time, unless otherwise waived or relinquished in the Plan; (x) utilize Assets to purchase appropriate insurance to insure the acts and omissions of the Liquidating Trustee; and (xi) act and implement the Plan and orders of the Bankruptcy Court;

- Wind up, dissolve, or otherwise provide for the dissolution and termination of any subsidiary or affiliate of any of the Debtors, including the payment of costs, claims or expenses associated therewith; and

- Employ Persons to assist in the orderly liquidation of Assets, including, without limitation, attorneys on a contingency basis.

**10.3    Selection of Agents.**

The Liquidating Trustee may retain his or her firm or company to provide professional services in conjunction with his duties under the Plan or the Liquidating Trust Agreement. The Liquidating Trustee shall not be liable for any loss to the Liquidating Trust or any person with an interest in the Liquidating Trust by reason of any mistake or default of any such agent or consultant unless such mistake or default breaches the standard of care set forth in Section 7.5(a) of the Plan.

**10.4    Maintenance of Register.**

The Liquidating Trustee shall at all times maintain a register of the names, addresses, and amount of the Claims against the Liquidating Trust as of the Effective Date and as revised from time to time thereafter.

**10.5    Liability of Liquidating Trustee.**

**A.    Standard of Care.**

The Liquidating Trustee shall not be liable for any action taken or omitted to be taken by him in good faith and in the exercise of reasonable judgment and believed to be within the discretion or power conferred by the Plan, or be responsible for the consequences of any act or failure to act, except for gross negligence or willful misconduct. The Liquidating Trustee shall not have any fiduciary relationship with any party by virtue of the Plan except as specifically set forth in the Plan or the Liquidating Trust Agreement:

      **1.**    The Liquidating Trustee shall not, solely by virtue of his position as Liquidating Trustee, be liable or in any way responsible for the acts or omissions of any Debtor, its respective board of directors, officers, employees, or agents, that occurred prior to the Effective Date.

      **2.**    Unless indemnified to his satisfaction against liability and expense, the Liquidating Trustee shall not be compelled to do any act or to take any action with respect to the execution or enforcement of the powers created under the Plan or to prosecute or defend any suit in respect of the Plan. If the Liquidating Trustee requests approval from the Bankruptcy Court with respect to any act or action in connection with the Plan, the Liquidating Trustee shall be entitled (but shall not be required) to refrain from such act or action (without incurring any liability to any person by so refraining) unless and until he has received Court instructions or approval from the Court. In no event shall the Liquidating Trustee or any of his representatives be required to take any action which he reasonably determines could lead to criminal or civil liability.

**3.** The Liquidating Trustee shall not be responsible in any manner to the Debtors, their Estates, any holder of a Claim or Equity Interest, or any party-in-interest for:

(a) the creditworthiness of any party and the risks involved to the Liquidating Trust or such holder or party-in-interest;

(b) the effectiveness, enforceability, genuineness, validity, or any due execution of the Plan as to any person other than the Liquidating Trustee;

(c) any representation, warranty, document, certificate, report, or statement made herein or furnished hereunder or in connection with the Plan that does not constitute a breach of the standard of care set forth in Section 7.5(a) of the Plan on the part of the Liquidating Trustee;

(d) the existence, priority or perfection of any existing Lien;

(e) the observation or compliance with any of the terms, covenants, or conditions of the Plan on the part of any party thereto other than the Liquidating Trustee;

(f) any loss to the Liquidating Trust resulting from the investment of the Assets, or their proceeds, in any Permitted Investments;

(g) any loss or claim arising from the windup, dissolution, or termination of any subsidiary of the Debtors pursuant to Section 7.2(g) of the Plan; or

(h) losses to any retirement, employee benefit, or pension plan of the Debtors in excess of the amounts available to be distributed from such plans.

The Debtors, holders of Claims or Equity Interests and parties-in-interest, by voting for the Plan and/or accepting the benefits of the Plan, have agreed not to sue or otherwise pursue or seek damages from the Liquidating Trustee except for actions or omissions which violate the standard of care set forth in Section 7.5(a) of the Plan.

**B.** **No Liability for Acts of Predecessor.**

No successor Liquidating Trustee shall be in any way responsible for the acts or omissions of any preceding Liquidating Trustee, nor shall he be obligated to inquire into the validity or propriety of any such act or omission unless such successor Liquidating Trustee expressly assumes such responsibility. Any successor Liquidating Trustee shall be entitled to accept as conclusive any final accounting and statement of Assets furnished to such successor Liquidating Trustee by any preceding Liquidating Trustee and shall be responsible only for those Assets included in such statement.

### C.    No Implied Obligations.

The Liquidating Trustee's liability shall be limited to the performance of such duties and obligations as are specifically set forth in the Plan or in the Liquidating Trust Agreement.  The Liquidating Trustee shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations, or warranties in the Plan, in the Disclosure Statement or in any documents or instrument evidencing or otherwise constituting a part of the Assets.  The Liquidating Trustee makes no representations as to the value of the Assets.

### D.    Reliance by Liquidating Trustee on Documents or Advice of Counsel or Other Persons.

The Liquidating Trustee may rely conclusively and shall be protected in acting upon any order, notice, demand, certificate, opinion or advice of counsel, statement, instrument, report or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information therein contained) which the Liquidating Trustee believes to be genuine and to be signed or presented by the proper persons.  Subject to his obligation to meet the standard of care in Section 7.5(a) of the Plan, the Liquidating Trustee shall have no liability for any act which he may do or omit to do in reliance upon the foregoing.

### E.    No Personal Obligation for the Debtors' Liabilities.

Holders of Claims and Equity Interests, and other persons transacting business with the Liquidating Trustee in his capacity as Liquidating Trustee, shall be limited to the Assets to satisfy any liability incurred by the Liquidating Trustee to such person in carrying out the terms of the Plan, and the Liquidating Trustee shall have no personal obligation to satisfy any such liability.

### 10.6    Reports; Tax Returns.

The Liquidating Trustee shall prepare and submit any and all reports required under the Plan and as may be further ordered by the Bankruptcy Court.  After the Effective Date, the Liquidating Trustee shall be responsible for the filing of any and all federal and state tax returns required by law to be filed by the Liquidating Trust, including the final tax returns, and shall pay from the Assets all tax liabilities arising from such tax returns.  The Liquidating Trustee shall also be authorized to file any tax returns required to be filed by the Debtors.

### 10.7    Trust Reserve.

The Liquidating Trustee will establish the Trust Reserve, in an amount to be determined by the Liquidating Trustee in consultation with AMF, for the payment by the Liquidating Trustee of all expenses of the Liquidating Trust, including, without limitation, the compensation of the Liquidating Trustee, compensation of the professionals retained by the Liquidating Trustee, and the payment of all other reasonable and reasonably anticipated expenses, debts, charges, liabilities and obligations relating to the Liquidating Trust and its administration, including, without limitation, any tax owed by the Debtors or the Liquidating Trust.  Any balance remaining in the Trust Reserve after the payment (as determined by the Liquidating Trustee) of

all expenses, debts, charges, liabilities and obligations intended to be paid therefrom will become available for distribution in accordance with the Plan.

**10.8    Compensation of Liquidating Trustee and His Agents.**

The Liquidating Trustee's compensation shall be based upon daily rates typically charged in the conduct of the Liquidating Trustee's business and may be paid from the Trust Reserve and the Assets on a monthly basis without further notice or order of the Bankruptcy Court. Agents retained by the Liquidating Trustee, including Professionals, may submit monthly statements to the Liquidating Trustee describing with reasonable particularity the amount of fees and expenses sought, the time expended, and the nature, extent, and value of the services provided during the period covered by such request. In the absence of objection by the Liquidating Trustee, such fees and expenses shall be paid within thirty (30) days of issuance of the monthly statement without further notice or order of the Bankruptcy Court. The Liquidating Trustee may retain, compensate, employ and pay agents and Professionals on other terms, including payment on a contingency basis and the provision of appropriate indemnification by the Liquidating Trust, without need for notice or any order of the Bankruptcy Court. In the event of any objection to a compensation request, the Bankruptcy Court shall retain jurisdiction to hear and determine such dispute. Payment of fees and reasonable out-of-pocket expenses of the Liquidating Trustee and any agents or consultants employed pursuant to the Plan shall be reimbursed as a priority from the Trust Reserve and, if necessary, the Assets.

**10.9    Liquidating Trustee's Indemnification.**

The Liquidating Trustee shall be indemnified by, held harmless, and receive reimbursement from the Assets for any and all claims, actions, demands, losses, damages, expenses, and liabilities, including without limitation court costs, attorneys' fees and accountants' fees incurred, except in the event that a court of competent jurisdiction determines that such losses or claims were the result of a breach of the standard of care set forth in Section 7.5(a) of the Plan.

**10.10    Removal of Liquidating Trustee.**

The Liquidating Trustee may be removed only for cause upon a motion to the Bankruptcy Court. If the Liquidating Trustee is removed for cause, the Liquidating Trustee shall not be entitled to any accrued but unpaid fees, reimbursements or other compensation. The term "cause" shall mean: (a) the Liquidating Trustee's gross negligence or willful failure to perform his duties under the Plan, (b) the Liquidating Trustee's misappropriation or embezzlement of any Assets or the proceeds of the Assets, or (c) the Liquidating Trustee's continued or repeated negligence or failure to perform his duties under the Plan. If a Liquidating Trustee is removed or is unwilling or unable to serve by virtue of his inability to perform his duties due to death, illness, or other physical or mental disability, following the liquidation of all or substantially all of the Assets, or for any other reason whatsoever, subject to a final accounting, such Liquidating Trustee shall be entitled to receive all accrued and unpaid fees, reimbursement of expenses, and other compensation incurred before his removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Liquidating Trustee.

### 10.11   Resignation of Liquidating Trustee.

A Liquidating Trustee may resign upon motion to the Bankruptcy Court, which resignation shall become effective at the time specified by the Court.  If a Liquidating Trustee resigns from his position hereunder, subject to a final accounting, such Liquidating Trustee shall be entitled to receive all accrued unpaid fees, reimbursement of expenses, and other compensation incurred before his resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Liquidating Trustee.

### 10.12   Successor Liquidating Trustee.

In the event that a Liquidating Trustee is removed, resigns, or otherwise ceases to serve as Liquidating Trustee, a successor Liquidating Trustee may be appointed by AMF, subject to approval by the Bankruptcy Court, or by order of the Bankruptcy Court after notice and a hearing.

### 10.13   Third Parties.

Except as set forth in the Plan, there is no obligation on the part of any party transacting business with the Liquidating Trustee or any agent of the Liquidating Trustee to: (a) inquire into the validity, expediency, or propriety of any transaction, (b) inquire into the authority of the Liquidating Trustee, or any agent of the Liquidating Trustee, to enter into or consummate the transaction, or (c) to monitor the application of the purchase money or other consideration paid or delivered to the Liquidating Trust.

### 10.14   Bond and Insurance Requirements.

On the Effective Date, or immediately thereafter, the Liquidating Trustee shall procure a bond in an amount equal to undistributed Cash on hand as of the Effective Date.  The bond shall be written by an insurance company authorized to do business in the State of New York and written on a standard and customary bond form.  The Liquidating Trustee may adjust the amount of the Bond in his business judgment; provided that, in no event shall the amount of the bond be less than the amount of undistributed Cash on hand. No bond shall be required if and when the value of the Assets shall be less than $200,000.00.

## XI.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 11.1   Rejection of Executory Contracts and Unexpired Leases.

Pursuant to Sections 1123(b)(2) and 365(a) of the Bankruptcy Code, any Executory Contract or Unexpired Lease (excluding insurance policies) that (a) has not expired by its own terms on or prior to the Confirmation Date, (b) has not been assumed, assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Confirmation Date, (c) is not the subject of a motion to assume or reject which is pending at the time of the Confirmation Date, or (d) is not designated by the Debtors as being an Executory Contract or Unexpired Lease to be assumed at the time of Confirmation of the Plan, shall be deemed rejected on the Effective Date.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute the approval

of the rejection of Executory Contracts and Unexpired Leases pursuant to Section 8.1 of the Plan and Sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

### 11.2    Rejection Damage Claims.

If the rejection of an Executory Contract or Unexpired Lease by the Debtors pursuant to the Confirmation Order results in a Claim by the other party or parties to such contract or lease, any claim for damages, if not previously evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estates, the Liquidating Trust and their respective properties, agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon the Liquidating Trustee on or before thirty (30) days following the Confirmation Date. Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim are timely filed will be treated as a General Unsecured Claim against the relevant Debtor subject to the provisions of the Plan. The Liquidating Trustee shall have the right to object to any such Claim for rejection damages in accordance with the Plan.

## XII.    RELEASE AND SATISFACTION OF CLAIMS

### 12.1    Compromise and Settlement of Claims, Interests and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trustee may compromise and settle Claims against them and Causes of Action against other Persons.

### 12.2    Release of Claims and Termination of Equity Interests.

Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, and release, effective as of the Effective Date, of all Claims, Equity Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Equity Interests in, any Debtor, the Assets, and the Liquidating Trust, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or

43

before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such Claim, debt, right or Equity Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim or Equity Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Equity Interest that existed before or on account of the filing of the Bankruptcy Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the release of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### 12.3    Injunction Relating to the Plan.

As of the Effective Date, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against any Debtor, its Estate, the Liquidating Trust, the Assets, and/or the Liquidating Trustee, on account of, or respecting any Claims, Equity Interests, debts, rights, obligations, Causes of Action or liabilities that are released, terminated, or exculpated pursuant to the Plan, except to the extent expressly permitted under the Plan.

### 12.4    Releases by the Debtors.

Pursuant to Section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Debtor Released Parties to facilitate the expeditious liquidation of the Debtors, on and after the Effective Date, the Debtor Released Parties are deemed released and discharged by the Debtors, the Liquidating Trust, and each Estate from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any Debtor, the Liquidating Trust, any Estate or any of their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Bankruptcy Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Debtor Released Party, the restructuring of Claims and Equity Interests before or during the Bankruptcy Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Confirmation Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence.

**12.5    Releases of Debtors and Liquidating Trust by Holders of Claims.**

Except as otherwise set forth in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (a) each holder of a Claim that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each Person that has held, holds or may hold a Claim or at any time was a creditor of any Debtor and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release and waive all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Liquidating Trustee's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the Bankruptcy Cases or the Plan that such entity has, had or may have against any Debtor, any Estate, the Assets, or the Liquidating Trust.

**12.6    Releases of Third Parties by Holders of Claims**

Except as otherwise set forth in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim that votes in favor of the Plan will be deemed to forever release and waive all claims (including any derivative claims), obligations, suits, judgments, damages, demands, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the Bankruptcy Cases or the Plan that such entity has, had or may have against the Debtor Released Parties.

**12.7    Cancellation of Existing Indebtedness and Liens.**

Except as may otherwise be provided in the Plan, on the Effective Date: (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against any Debtor, together with any and all Liens securing same, shall be canceled, discharged and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of any Debtor thereunder shall be deemed cancelled and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Liquidating Trust. To the extent deemed necessary or advisable by the Liquidating Trustee, any holder of a Claim shall promptly provide the Liquidating Trustee with an appropriate instrument of cancellation, discharge or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge or release, including the cancellation, discharge or release of any Lien securing such Claim.

**12.8    Exculpation.**

Except as otherwise set forth in the Plan, none of the Debtor Released Parties, shall have or incur, and each Debtor Released Party is hereby released and exculpated from, any liability to any holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns, for any act or omission, occurring prior to the Effective Date, in connection with, relating to, or arising out of, the administration of the Bankruptcy Cases, the Disclosure Statement, the formulation, negotiation, or implementation of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, provided that the terms of Section 9.8 of the Plan shall not apply to any liability for willful misconduct or gross negligence.

**12.9    Setoffs.**

Except as expressly provided in the Plan, nothing contained in the Plan shall constitute a waiver or release by the Estate of any rights of setoff the Estate may have against any Person.

## XIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, EACH CREDITOR AND EQUITY INTEREST HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF TAX ISSUES HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY CREDITOR OR EQUITY INTEREST HOLDER FOR THE PURPOSE OF AVOIDING ANY TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS DESCRIBED HEREIN; AND (C) EACH CREDITOR AND EQUITY INTEREST HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following is a general summary of certain material federal income tax consequences of the Plan and the distributions provided under the Plan.  This summary does not discuss all aspects of federal taxation that may be relevant to a particular creditor in light of its individual investment circumstances or to certain creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, financial institutions, broker-dealers, life insurance companies, foreign corporations or individuals who are not citizens or residents of the United States).  This summary does not discuss any aspects of state, local or foreign taxation.  The impact on holders of Claims and Equity Interests that are not "U.S. persons" (as that phrase is defined in the Internal Revenue Code of 1986, as amended (the "**IRC**")) is not discussed.  Therefore, use of the term "**holder**" or "**U.S. holder**" herein shall refer to a "holder of a Claim or Equity Interest that is a U.S. Person."  This summary does not discuss the tax consequences to IFEC, its shareholders, its creditors or to any other party not entitled to vote for the Plan.  Rather this summary addresses only certain United States federal income tax consequences to those parties entitled to vote on the Plan.  Further, this summary

does not address tax consequences to parties not entitled to any recovery under the Plan, such as the IFEC LP Equity Interests (Class 4A).

This summary is based upon the IRC, the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, due to a lack of definitive judicial or administrative authority or interpretation certain tax aspects contemplated in the Plan are uncertain. The Debtors have not requested a ruling from the Internal Revenue Service (the "**IRS**") with respect to these matters and no opinion of counsel has been sought or obtained by the Debtors with respect thereto. There can be no assurance that the IRS or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. **THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR OR INTEREST HOLDER, NOR ARE THE DEBTORS RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.**

**13.1    Federal Income Tax Consequences to the Debtors.**

IFEC LP and FXC are both treated as partnerships for U.S. federal income tax purposes and therefore do not recognize gain or loss at the entity level. Rather, items of income, gain, loss and deductions pass through to the Debtors' Equity Interest holders.

**13.2    Tax Consequences to Holders of Claims.**

In General. The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, on: (a) whether the holder of the Claim receives consideration in more than one (1) tax year, (b) whether the holder of the Claim is a resident of the United States, (c) whether the holder of the Claim reports income using the accrual or cash method of accounting, (d) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim, and (e) whether the Claim was acquired at a discount and whether the market discount rules are applicable to the holder.

If a Claim is held by an entity taxable as a partnership for U.S. federal income purposes, the tax treatment of a partner (or member) generally will depend upon the status of the partner (or member) and the activities of the partnership (or limited liability company). If you are a partner (or member) of a partnership holding a Claim, you are urged to consult your own tax advisor.

Gain or Loss on Exchange. The Plan contemplates that holders of Claims will either receive cash or an interest in the Liquidating Trust. Generally, a holder of an Allowed Claim will realize a gain or loss under the Plan on the exchange of the holder's Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property (including an interest in the Liquidating Trust) received by the holder (other than any consideration attributable

to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain if the Claim was a capital asset in the hands of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Beneficiaries of Liquidating Trusts. The transfer of the Assets to the Liquidating Trusts is intended for United States federal income tax purposes to be treated as a transfer of the Assets to the holders of Claims followed by a deemed transfer by such holders (the "**Beneficiaries**") to the Liquidating Trusts. The Liquidating Trusts are intended to be treated as "grantor" trusts, and the Beneficiaries are intended to be treated as the grantors and deemed owners of their pro rata share of the Assets. The Liquidating Trustee will value the Assets and notify the Beneficiaries of such valuations, and the Assets will be valued consistently by the Liquidating Trustee and the Beneficiaries for all federal income tax purposes. In connection with all distributions made pursuant to the Liquidating Trusts and all activities of the Liquidating Trusts, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions made pursuant to the Plan and the Liquidating Trusts will be subject to any such withholding and reporting requirements.

The federal income tax treatment of payments received by Beneficiaries with respect to their interests in the Assets is not clear. A Beneficiary should take a basis in its pro rata interest in the Assets equal to the fair market of such interest on the Effective Date. A Beneficiary will recognize gain or loss with respect to its interest in the Assets to the extent amounts received by the Beneficiary from the Liquidating Trusts are greater than or less than the Beneficiary's basis in its pro rata interest in the Assets. Holders of Allowed Claims are urged to consult their tax advisors concerning the tax consequences of holding an interest in the Liquidating Trusts.

**13.3    Backup Withholding and Information Reporting.**

Under the backup withholding rules of the IRC, holders of Claims may be subject to backup withholding at the rate of twenty-eight percent (28%) with respect to payments made pursuant to the Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's U.S. federal income tax liability. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

Treasury regulations general require disclosure by taxpayers of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions, that result in the taxpayer claiming a loss in excess of certain thresholds. We urge you to consult your own tax advisor regarding these regulations and whether the

contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return or otherwise.

**13.4    Importance of Obtaining Professional Tax Assistance.**

THE PRECEDING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH THE ASSISTANCE OF A TAX PROFESSIONAL.  HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XIV.    PLAN FEASIBILITY

**14.1**    The Debtors expect to have sufficient funds to pay in full projected Allowed Administrative Expense Claims, Allowed Priority Claims, and Allowed Priority Tax Claim. Accordingly, the Plan satisfies the feasibility requirements of Section 1129 of the Bankruptcy Code.

## XV.    BEST INTERESTS OF CREDITORS

**15.1**    In the event of a conversion of the Bankruptcy Case to Chapter 7, the Debtors believe that the amount and timing of distributions would be adversely affected.  A Chapter 7 trustee would be appointed who might have no familiarity with the Bankruptcy Case.   The Chapter 7 trustee would be entitled to a commission on funds distributed by the Liquidating Trust as follows: (i) twenty-five percent (25%) of the first $5,000; (ii) ten percent (10%) of any amount distributed in excess of $5,000 up to $50,000; (iii) five percent (5%) of any amount distributed in excess of $50,000 up to $1,000,000; and (iv) three percent (3%) of amounts distributed in excess of $1,000,000.  The appointment of a Chapter 7 trustee, and the Chapter 7 trustee's retention of new professionals, would likely result in a substantial learning curve and lessen the institutional knowledge necessary to administer the case.  The Bankruptcy Court would establish a supplemental bar date for the filing of Claims.  The Estate representative would need to review new Claims filed, which might necessitate the filing of additional objections to claims and further delay payment of the initial distribution.  Because the Assets would remain in the Debtors' bankruptcy estates, the Estate would likely incur a greater tax liability associated with the receipt of the Asset Sale Consideration, which would further dilute the recovery to holders of Allowed Claims.

**15.2**    For the reasons set forth above, creditors will receive or retain under the Plan at least the amount or value that such creditors would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code, and such distribution will likely occur on a more expedited basis.  Consequently, the best interests of creditors requirement set forth in Section 1129(a)(7) of the Bankruptcy Code has been satisfied.

**15.3**    Based upon the prospects for reduced costs and earlier payment to creditors, the Debtors recommend that the wind-down and liquidation of the Debtors' financial affairs be completed pursuant to the terms of the Plan.

Dated: December 18, 2014

International Foreign Exchange Concepts Holdings, Inc., International Foreign Exchange Concepts, L.P. and FX Concepts LLC

_____/s/ Michael Meenan_____
By:   Michael Meenan, Chief Restructuring Officer

Submitted by:

Finn Dixon & Herling LLP
177 Broad Street
Stamford, Connecticut 06901
Henry P. Baer, Jr., Esq.
Tony Miodonka, Esq.
Telephone: (203) 325-5000
Facsimile:  (203) 325-5001

*Counsel to the Debtors*